NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 2

No. 2015-133

| | |
|---|---|
| Raymond Knutsen | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Family Division |
| | |
| Karen Cegalis | December Term, 2015 |

Nancy Corsones, J.

Robert P. McClallen, Rutland, for Plaintiff-Appellee.

Karen Cegalis (On the Brief), Pro Se, Waterbury, and Kevin M. Volz (Oral Argument), Rutland, for Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **REIBER, C.J.** Mother appeals pro se from the trial court's order on parents' cross-motions concerning their minor son. Father moved to terminate efforts to reestablish parent-child contact with mother, and mother moved to modify parental rights and responsibilities. The court denied mother's motion to modify, and it did not allow mother any rights of parent-child contact until August 2016, unless the child's trauma therapist recommended contact earlier. Mother argues that the court's findings are inadequate, and that the findings do not support the court's conclusion. We conclude that the trial court acted within its discretion, and affirm.

¶ 2. Mother and father are the parents of a son, born in August 2005. The parties never married and their relationship ended in February 2006. The court awarded father primary

custody in 2009, concluding at that time that he had a superior ability to foster the child's relationship with the other parent, and a superior disposition to meet the child's developmental needs. We affirmed the court's decision on appeal. Knutsen v. Cegalis, 2011 VT 128, 191 Vt. 546, 35 A.3d 1059. Father has since married another woman.

¶ 3. This case has a long procedural history, which we set forth below.

## I. October 2012 Decision

¶ 4. In September 2012, the court held a four-day hearing on father's petition on behalf of the child for a final relief-from-abuse order against mother, as well as on mother's cross-motion to modify parental rights and contact. According to father, in May 2012, the child related that over the prior few months, mother and her boyfriend had sexually abused him. Mother vigorously denied the allegations. The court found that, taking all of the credible evidence into consideration, father failed to prove by a preponderance of the evidence that mother abused the child. It thus denied his request for a final restraining order.

¶ 5. As to mother's motion, the court found that the ongoing dispute between parents had not abated over the years. Mother had created a website in which she posted intensely critical tirades about father. The court found that mother's behavior impaired the child's ability to have a good relationship with the three adult caregivers in his life. The court also had concerns about mother's parenting skills based on her in-court demeanor. The court did not believe that the child was deliberately lying about the alleged assaults, but concluded that he was making extraordinarily serious and very negative statements about mother because he lacked the ability to cope with mother's evident hatred of father, and he wanted it to stop. The court concluded that there clearly had been a real, substantial, and unanticipated change in circumstances based on mother's estrangement from the child. It determined that it was not in the child's best interests to simply return to the old schedule as the child had not seen or spoken to mother in five months. The court found therapeutic involvement essential to securely support

2

the child in restarting his relationship with mother. It enlisted the services of a local psychologist to create and initiate a plan of contact. It also emphasized the need for forensic psychiatric evaluations of parents and the child.

## II. October 2013 Decision

¶ 6. In an October 2013 decision, following seven days of hearings, the court considered what plan of reunification, if any, was in the child's best interests. Dr. Craig Knapp had conducted a forensic evaluation of parents and the child. The court found that father and stepmother saw the forensic evaluation as a vehicle to once again attempt to establish that the child had been assaulted by mother. Dr. Knapp participated in meetings between mother and the child and concluded that the description of the child being intensely fearful of mother was not at all borne out by what he observed. While the child appeared to genuinely believe the allegations he had made, his relationship with mother was rekindled, in a positive way, within minutes of seeing her. And, when the session with mother ended, the child's first fear was that his father and stepmother would be angry at him for enjoying his time with mother.

¶ 7. The court found that mother was loving and caring toward the child, and there was no indication that she would condone anyone harming the child in any way. Mother had difficulty restraining negative emotions, however, and she had a very concerning inability to manage feelings of resentment. Mother was engaged in therapy, which appeared to help with these issues, but mother continued to struggle with this problem. Father had a history of being able to care for the child physically and emotionally. Father had a tendency to withdraw from conflict, however, and as this conflict continued, father became increasingly stressed. He now exhibited paranoia that mother was going to kill him, his wife, and the child. He asserted that mother was a psychopath and a sociopath. The court found none of father's fears or conclusions supported by any credible evidence in the record. The court believed that father's fears were fueled by the very strong and demonstrated antipathy that stepmother had toward mother.

3

Stepmother's antipathy became far more overt after November 2011. The court found no credible factual basis to support the child's allegations of abuse, much less to support any finding that mother was a homicidal psychopath.

¶ 8. The court did not have any psychological evaluation of stepmother, which it found extremely unfortunate. While stepmother was overwhelmingly committed to protecting the child's physical and psychological safety, she took actions that were not in the child's best interests. In January 2013, for example, she took the child to Canada, where mother's boyfriend lived, so that the child could tell the Ottawa police about the alleged abuse. The police chose not to talk with the child, and after several hours, the stepmother drove home. Her conduct revealed that she would stop at nothing to involve the child directly in her efforts to literally and figuratively prosecute mother and mother's boyfriend. Stepmother's insistence on putting the child in the middle of her crusade spoke volumes about the sources of the child's estrangement from mother. Stepmother was adamant, as was father, that the child's statements of abuse were entirely truthful and accurate. She was committed to preventing contact between the child and mother as she believed that the child would be killed if he saw his mother or her boyfriend again. The court viewed stepmother's actions with an extraordinary degree of concern given the intensity of this belief, combined with the total lack of any objective, credible facts to support it.

¶ 9. As to the child, the court found that he was a bright, engaging, and loving child. Except for the reactions he had displayed since May 2, 2012, he was mentally healthy. Before that date, the child had had a good time with mother and was not in any way afraid of her. The child's allegations about abuse had not been determined credible by the Chittenden Unit for Special Investigations, by the Department for Children and Families (DCF), or by the court. Objectively provable aspects of his statements have been proven in fact to be untrue. Before May 2012, the child never made any statements to others about being abused; mother's relatives observed no acts of abuse; and the child never appeared to be uncomfortable or upset in any way

4

when these relatives were present. Until after May 4, 2012, the child never expressed any fear to anyone that mother would harm him. Indeed, when he talked to law enforcement and DCF on May 4, 2012, he expressed that he was fine with seeing his mother that weekend. It was only when the allegations were repeated to a therapist on several occasions that he began to express fear and hatred of mother. It was only months later that he developed a fear that she was going to kill them all.

¶ 10. The court found the most likely explanation for the child making the statements was his attempt to adapt to the increasing hostilities between the two households. The court found that the child was indisputably affected by father's and stepmother's reactions to his initial statements. He had a strong bond with stepmother and did not want to disappoint her. The court determined that mother, father, and stepmother had not acted in a way to substantially advance the child towards having a safe and secure relationship with mother. In doing so, they had undermined the potential for the child to create and maintain healthy and secure attachments going through adolescence and adulthood.

¶ 11. The court concluded that it was in the child's best interests to reestablish his relationship with mother. It reiterated that there was no credible evidence that his allegations of abuse were true. The court found that the child's relationship with mother was of fundamental and critical importance. There was significant damage that needed to be repaired before that relationship could again flourish. The court ordered a reunification process to be overseen by a parent coordinator, using one reunification therapist for the entire family, with each family member having access to their own separate therapist.

¶ 12. The court outlined its concerns and goals for this process. It recognized that father and stepmother had a strong incentive to slow the process, but stated that the time had long since come for them to recognize and internalize that the child's allegations had not been substantiated in any forum, and to accept that it was fundamentally wrong to deny a child a

5

relationship with his parent. The court warned that it would not tolerate any interference by father and stepmother in rebuilding the child's relationship with his mother.

### III. February 2015 Decision

¶ 13.   This brings us to the decision on appeal, which was issued in February 2015, fifteen months after the court's prior ruling. The ruling followed three days of hearings. At the outset of its decision, the court again emphasized that the abuse claims were baseless. Father, stepmother, and the child nonetheless remained convinced that mother and her boyfriend assaulted the child. Over time, their allegations had expanded to wide-ranging accusations that mother began assaulting the child when he was an infant and that mother intended to kill all three of them. None of the allegations were grounded in fact, but they had resulted in mother's estrangement. This estrangement constituted the real, substantial, and unanticipated change in circumstances in October 2012. Mother has seen the child twice since May 2012. The court explained that, since its prior order, parent coordination and the corresponding reunification efforts had been terminated by the therapists at Hummingbird Associates. The question remained what schedule of contact, if any, was in the child's best interests, or, alternatively, if awarding parental rights to mother was in the child's best interests.

¶ 14.   The child was now nine and in the fourth grade. He was doing well in school and he socialized well with other children. He was in all outward respects a normal and happy child. The child was entirely enmeshed, however, in father's belief that mother abused him, and the notion of the abuse was consistently reinforced by father and stepmother.

¶ 15.   A reunification therapy team had been put in place in May 2014, and the child began therapy in July 2014. The therapist had individual sessions with mother, and with father and stepmother. The therapist asked father, stepmother, and the child's former therapist not to speak with the child regarding the allegations of abuse or his mother or what happened in therapy. The therapist indicated that father and stepmother were "desperate" that the child not

6

meet with mother or return to having any kind of contact with her. They expressed their belief that the court had been "paid off" to issue its decisions ordering reunification. They also expressed their belief that mother had threatened the court and the child's former attorney. Additionally, they attributed various statements to Dr. Knapp. None of these assertions had any basis in fact.

¶ 16. The therapist noted that, while in session and engaged in play and conversation, the child seemed happy. This was borne out by the recording of the session. When the child realized that his stepmother had arrived to pick him up, he would stop smiling, appear sad, and would transition to his stepmother with that presentation. He did not want his stepmother to observe that he had been lighthearted while visiting the therapist. After seven weeks of therapy, the therapists concluded that the child was deeply traumatized and that he firmly believed that his mother was going to kill him, his father, and stepmother. The child told the therapist that "this is all we ever talk about." He expressed anger and frustration at "the court," which appeared to represent judges, lawyers, and therapists. The therapists concluded that from the child's perspective, "it never ends for him." The child now contended that mother had threatened to kill him at a school play, that she had tried to kill him, and that mother and her boyfriend wanted to kill his father. The court believed that the child said these things because he had been in the sole care and control of father and stepmother for two and a half years and their unrelenting negative attitude against mother had taken an unshakeable hold on him.

¶ 17. Father and stepmother denied talking to the child about therapy, but they were unable to explain why the child told the therapist that "this is all they talk about at home." Either they, or the child, were lying, and the court found that doubts about these parties' credibility affected every aspect of this case. Despite their concerns that the child was being affected by father and stepmother's interference with therapy and reunification, the therapists felt it was contraindicated to continue the reunification process, given the level of the child's trauma they

7

observed in therapy. In their view, it did not matter why the child believed mother wanted to kill him, their paramount concern was the risk to the child's psychological wellbeing if efforts to reinstate contact between him and his mother continued. The therapists recommended that the child engage in weekly counseling with an experienced trauma informed clinician and that father and stepmother also engage in regular counseling. They recommended that the possibility of reintroducing the child to his mother be brought up, if indicated by his therapy, when the child reached adolescence. One of the therapists testified that she did not believe that "forcing" the child to visit mother was best for him, given his level of trauma. She did not endorse foster care for the child. She believed that suddenly taking the child away from his home environment could trigger serious depression for him. The court noted that the therapist had made a recommendation for trauma therapy in September 2014 and, in the three months from that date to the trial date, father made no arrangements for the child to begin receiving this therapy.

¶ 18. Father testified that he would be willing to participate in therapy; stepmother said that she would not participate in therapy. She reiterated her belief that mother abused the child and asserted that she too was a "victim" of mother. The court again expressed that it viewed stepmother's actions in this case with an extraordinary degree of concern. It was convinced that stepmother bore near total responsibility for alienating the child from his mother. Father now appeared totally invested in stepmother's claims about years of abuse and mother's homicidal intent. The court thus found that some of the responsibility for the unfounded estrangement between mother and child now belonged to father as well.

¶ 19. The court found it very clear that father and stepmother were waging war against mother and making allegations of abuse that were not true. Father, and more egregiously stepmother, had indoctrinated the child to believe that mother was out to kill him and that mother viciously abused him since he was a small child. The court found it difficult to imagine a more complete destruction of a parent-child relationship based on false allegations of abuse. Whether

8

the experts labeled it alienation or not, father and stepmother clearly had destroyed the child's formerly good relationship with mother. The court found mother's expert, Dr. Eric Mart, a very credible expert in the field and he offered his expert opinion on the general issue of parental alienation. He opined that in cases where parental alienation exists, one sees an "unjustified campaign of denigration and disrespect," and the child has "nothing good to say" about the other parent. The court found that that description fit the facts of this case very closely. Dr. Mart also expressed that in cases of parental alienation, the child becomes "over empowered," which also fit the facts of this case.

¶ 20. Turning to mother, the court found that she had acknowledged the court's earlier concerns about her stability and mental health. She had engaged in different forms of therapy over the prior years. The court found that she now appeared far more composed and organized in her presentation than she had since the very first trial many years ago. Mother believed that if she were awarded custody, the child would withstand the transition well.

¶ 21. The court found this to be a heartbreaking case. It was thoroughly convinced that father and stepmother were solely responsible for the child's trauma and for his utter estrangement from mother. It did not believe that any of the allegations of abuse had any foundation in fact whatsoever. Yet, two therapists had credibly testified that the child would be at serious risk of severe depression and even suicide if he was forced to see mother. If forced to live with mother, one of the therapists testified that it would be a significant and traumatic event for the child. The court concluded that it could not simply order the child to live with mother, even though it was "the right thing to do." Instead, it must consider what course of action was in the child's best interests as set forth by statute. The court found the controlling factors were the quality of the child's present adjustment to his home, school, and community, and the potential effect of any change. The child was doing well in school, he was well liked by his peers, and he loved being in his home with his pets and with many activities to enjoy. He had lived in the

9

same community since kindergarten. The court again cited the expert testimony from one of the therapists that the child would be at significant risk of mental health problems if removed from father's home. From the therapist's perspective, it did not matter why the child was at risk, it could not be ignored that he was at risk. The court noted that the child had never been to mother's new home. He did not know her new community, and would have no peers to turn to for companionship. He would not have his pets; he would have to go to a new school. The court found that this change would be a "violent dislocation" cautioned against by this Court in deciding modification of parental rights cases.

¶ 22. The court stated that the fact that the child had seen mother only twice in two-and-a-half years was not an overriding factor against awarding parental rights to mother. The court had no doubt that, but for father and stepmother's actions, the child's natural love and affection for mother would likely return if he were reunited with her. The risk was that father and stepmother would not then refrain from further alienating behavior. The child lacked the innate ability to withstand their attitudes about mother. In short, the court reasoned, if it gave custody to mother, the child would still see father and stepmother, and the prospect of regular contact with them would only perpetuate his exposure to their egregious behavior.

¶ 23. The court expressed concern that the child would never have a normal relationship with mother, and that severing his relationship with mother based on unfounded allegations of abuse could damage the child's long-term psychological development. These concerns for the child's future development were counterbalanced by immediate concerns for his psychological equilibrium if his custody were to be abruptly transferred to mother. The court thus concurred in the recommendation of the parent coordinator to stop efforts at reunification at this time, with certain conditions. The court thus denied mother any parent-child contact, with the exception of letters and the like for the child to be mailed to the child's attorney.

10

¶ 24.  The court directed father to immediately obtain a child-trauma therapist, and to refrain from interfering, or allowing stepmother to interfere, with the child's therapy.  If the trauma therapist recommended it, in the context of therapy, the child could have telephone and in-person contact with mother at the therapist's office.  Father was also directed to engage in therapy, and to use his best efforts to encourage stepmother to engage in therapy as well.  On or before the child's eleventh birthday in August 2016, unless the child had already begun routine visits with mother as a result of the therapy ordered above, the court ordered that he recommence office visits with Hummingbird Associates, with a goal toward reunification with mother.

¶ 25.  Finally, the court ordered father to pay certain costs associated with the litigation, finding it abundantly clear that the child's trauma, estrangement from mother, and the colossal use of court, attorney, and guardian-ad-litem time, was due solely to father and stepmother's conduct.  The court reiterated that they had estranged the child from mother and that they had impeded reunification every step of the way, starting with the evaluation conducted by Dr. Knapp, and finishing with the therapy provided by Hummingbird Associates.   Mother appeals from the court's order.

## IV.  Arguments on Appeal

¶ 26.  Mother argues that the court's findings do not support its conclusions.  She questions the court's evaluation of the child's best interests, noting all of the negative findings with respect to father and stepmother.  Mother identifies numerous findings that she believes support her position that a modification of custody is in the child's best interests.  Mother maintains that she is being punished for the actions taken by father and stepmother.  According to mother, any "violent dislocation" due to a change in custody pales in comparison to allowing the child to continue to be subject to abuse in the form of "brainwashing" and alienation from mother.  She contends that the court placed too much weight on the recommendations of the court-appointed therapists and ignored her expert's recommendations.

¶ 27. Finally, mother takes issue with the court's statement that if she were awarded custody, father and stepmother would continue their campaign to undermine mother, which would only exacerbate the child's current trauma. Mother questions why, if this is so, the court could not curtail their contact with the child instead of rewarding them for their behavior by continuing to isolate the child from mother. Mother expresses dismay at the court's statement that she may never have a normal relationship with the child, and asks how the court can expect father and stepmother to cooperate with reunification at this point when they have been sternly warned not to interfere with reunification in the past to no avail.

¶ 28. We agree with the trial court that this is truly a heartbreaking case. As the trial court found, father and stepmother have traumatized the child and completely alienated him from his mother. Due to their actions, mother has seen the child only twice in almost three-and-a-half years. Their claims of abuse, which continue to expand, have been found baseless despite investigations by the Chittenden Unit for Special Investigations, the U.S. Department of Homeland Security, the Rutland Police Department, and the Department for Children and Families. Judging from father's brief, father and stepmother refuse to accept the court's decision. In his brief, father challenges mother's "premise" that the child falsely reported being abused, and argues that mother cites no portion of the transcript supporting this "theory." Father reiterates his assertion that the child's reports are true and that he has taken all appropriate legal steps to protect the child. These assertions are directly at odds with the trial court's findings and orders in this case.

¶ 29. The question here, however, is not whether this Court would have reached a different decision on these facts. The trial court has broad discretion in determining what course of action is in a child's best interests. Myott v. Myott, 149 Vt. 573, 578, 547 A.2d 1336, 1340 (1988). It is for the trial court, not this Court, to evaluate the credibility of witnesses and weigh the persuasiveness of the evidence. Cabot v. Cabot, 166 Vt. 485, 497, 697 A.2d 644, 652 (1997).

12

We must uphold the court's findings unless clearly erroneous, and we will uphold its legal conclusions where supported by the findings. Sochin v. Sochin, 2005 VT 36, ¶ 4, 178 Vt. 535, 872 A.2d 373.

¶ 30. The court recognized that father and stepmother have destroyed the child's relationship with mother. We have held that a child's best interests are "plainly furthered by nurturing the child's relationship with both parents, and a sustained course of conduct by one parent designed to interfere in the child's relationship with the other casts serious doubt upon the fitness of the offending party to be the custodial parent." Miller-Jenkins v. Miller-Jenkins, 2010 VT 98, ¶ 15, 189 Vt. 518, 12 A.3d 768 (quotation omitted); see also 15 V.S.A. § 650 (finding and declaring as public policy that it is in best interests of child to have "opportunity for maximum continuing physical and emotional contact with both parents unless direct physical harm or significant emotional harm to child is likely to result from such contact"). Nonetheless, as the trial court acknowledged, "The best interests of the child remain paramount in all custody decisions, and a decision to transfer custody cannot be based on a desire to punish the alienating parent." Miller-Jenkins, 2010 VT 98, ¶ 25; see also 15 V.S.A. § 665(b) (explaining that in making order concerning parental rights and responsibilities of minor child, court "shall be guided by" child's best interests, including consideration of statutory factors); but see Miller-Jenkins, 2010 VT 98, ¶ 25 (also recognizing that children thrive with love and support of both parents, and "[o]ne parent's attempts to hamper the other's parent-child relationship therefore typically demonstrates a lack of regard for the child's best interests and suggests that a transfer of custody may well be in the child's best interests"); Sundstrom v. Sundstrom, 2004 VT 106, ¶ 38, 177 Vt. 577, 865 A.2d 368 (mem.) (recognizing that "obstruction of visitation and attempts at parental alienation are not in a child's best interests, and they may form the basis for a change in custody," and citing cases so holding).

13

¶ 31. In this case, the court focused its analysis on the child's best interests. It recognized that father and stepmother had alienated the child from mother, but credited expert testimony that the child would be at significant risk of mental health problems if efforts at reunification with mother continued. As the therapist opined, it did not matter why the child was at risk; what mattered was that the risk existed. The court found that the expert's testimony satisfied the standard of clear and convincing evidence. See DeSantis v. Pegues, 2011 VT 114, ¶ 35, 190 Vt. 457, 35 A.3d 152 (court must make finding by clear and convincing evidence that any visitation would be detrimental to child's best interests before "halting all contact between parent and child"). While mother's expert recognized other possible courses of actions in parental alienation cases, the court was not obligated to take any of these actions or explain why it did not do so.

¶ 32. Like mother, we were initially puzzled by the court's statement that if mother were awarded custody, the child's regular contact with father and stepmother would only perpetuate his exposure to their egregious behavior. The alternative—that the child be exposed only to father and stepmother and remain constantly subject to their egregious behavior—would not seem to produce a better result. The court later clarified this point, however, apparently recognizing that the child will continue to be subject to this indoctrination by father and stepmother, regardless of which parent has custody, and this factor, combined with others, led the court to deny mother's motion to modify. As set forth above, the court concluded by a preponderance of the evidence that the child would experience a "violent dislocation" if mother were awarded custody. See Kilduff v. Willey, 150 Vt. 552, 555, 554 A.2d 677, 680-81 (1988) (recognizing "violent dislocation realized by a change in physical custody"). It reasoned that not only would the child have to move to an entirely new home, school, and community, but also there was no doubt that father and stepmother would continue their campaign to undermine mother, which would only exacerbate the child's current trauma.

14

¶ 33.    We conclude the trial court's order should be affirmed, not because the father and stepmother are correct in their accusations, or to reward or endorse the course of conduct in which they have engaged, but because the trial court's judgment regarding the best interests criteria was factually based and legally correct.  The record shows that the court considered all of the statutory best-interest criteria in reaching its decision and it provided a reasoned basis for its conclusions.  See Sundstrom, 2004 VT 106, ¶ 39 (recognizing that specific findings tied to each statutory factor unnecessary if findings as whole indicate that court took all relevant statutory factors into consideration in reaching its decision).  While mother disagrees with the court's conclusions, she has not demonstrated an abuse of discretion.  See Knutsen, 2011 VT 128, ¶ 13 ("That a different weight or conclusion could be drawn from the same evidence may be grist for disagreement, but does not show an abuse of discretion.").

¶ 34.    Finally, we acknowledge mother's frustration at father's and stepmother's interference in the reunification process since at least 2013 and the distressing unfairness of being denied contact with her child for more than three years based wholly upon false accusations.  We note that mother is not without recourse should father and stepmother continue to interfere with her attempts at reunification or should they defy the trial court's orders.

Affirmed.

FOR THE COURT:

_____
Chief Justice

¶ 35.    **ROBINSON, J., concurring.**   I concur, but with serious reservations that impel me to write separately.  This case implicates serious federal and state constitutional concerns.  I agree that the trial court's order, understood as a temporary measure, survives constitutional scrutiny, but that doesn't mean that a longer term extension of the trial court's order would

likewise pass muster. I write separately to emphasize the constitutional parameters that will come into sharper relief as this case moves forward.

¶ 36. That the parent-child relationship is a constitutionally protected liberty interest is well established and uncontroversial. See Santosky v. Kramer, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."). Reviewing a termination of parental rights pursuant to a New York statute, the United States Supreme Court explained that "until the State proves parental unfitness, the child and . . . parents share a vital interest in preventing erroneous termination of their natural relationship." Id. at 760. Because terminating parental rights is tantamount to destroying a family, the Court ruled that due process requires that the state must prove parental unfitness by at least clear and convincing evidence before terminating parental rights. Id. at 770, 776.

¶ 37. This showing of "parental unfitness" necessarily focuses on the parent's ability and disposition to parent his or her child. We have recognized that Santosky did not address the issue of what substantive showing is required to terminate parental rights, but merely "stands for the proposition that whatever measure of 'unfitness' a state requires to terminate parental rights must be shown by clear and convincing evidence." In re D.C., 2012 VT 108, ¶ 22, 193 Vt. 101, 71 A.3d 1191. In In re D.C., we explained that the best-interests criteria contained in our statute relating to juvenile proceedings, 33 V.S.A. § 5114(a), "encompass both directly and indirectly the question of parental fitness." In re D.C., 2012 VT 108, ¶ 22. The most important factor— and the one that most directly addresses parental fitness—is "whether the parent is likely to be able to resume parental duties within a reasonable period of time." Id. (citing 33 V.S.A. § 5114(a)(3)). The other best-interests factors implicate the parent's fitness "indirectly by requiring the court to examine the parent's relationship with the child and what kind of role the

16

parent has played and continues to play with respect to the child's welfare." Id. (citing 33 V.S.A. § 5114(a)(1), (2), (4)). We also noted that these factors generally come into play only after a child-in-need-of-care-or-supervision (CHINS) merits finding. Id. ¶ 24. We concluded in In re D.C. that the CHINS statutory framework as a whole "is aimed at ensuring not only that children are protected from harm but also that the parent-child relationship is preserved unless circumstances, as demonstrated by clear and convincing evidence, require terminating that relationship because the parent is incapable of caring for his or her child." Id. ¶ 26. In short, the question a court must answer is not simply whether, on the basis of clear and convincing evidence, terminating a parent's rights would leave a child better off; before terminating a parent's rights, a court must make findings by clear and convincing evidence that the parent in question is unwilling or unable to safely parent the child.

¶ 38. This Court has recognized that this requirement applies to divorce orders that effectively sever a parent-child relationship, as well as abuse and neglect cases in which the State seeks to formally terminate a parent's rights. In Mullin v. Phelps, 162 Vt. 250, 647 A.2d 714 (1994), this Court considered a case in which the trial court essentially cut off a father's contact with his two children after finding, by a preponderance of evidence, that the custodial father had sexually abused one of the children. The father denied abusing the child, and the trial court conditioned any contact between the father and his children on the father's acknowledgment of the sexual abuse. Id. at 258, 657 A.2d at 718. This Court recognized that even though the trial court's order left open the possibility of visits "for therapeutic purposes" between the father and his children at the behest of the children's therapists, as a practical matter, the trial court's order "effectively terminated" father's rights. Id. at 263, 657 A.2d at 721. Relying on the United States Constitution and the Supreme Court's analysis in Santosky, as well as on Chapter I, Article 10, of the Vermont Constitution, this Court concluded that a finding of sexual abuse by a preponderance of the evidence was insufficient, as a matter of due process, to terminate all

parent-child contact between the father and his sons in the context of a divorce case. Id. Although this Court upheld the trial court's finding of sexual abuse by a preponderance of the evidence, it held that "due process required the court either to find the existence of sexual abuse by clear and convincing evidence or to permit, at a minimum, continued contact between the father and the boys consistent with their safety." Id. at 268, 647 A.2d at 724.

¶ 39. The dissenters in Mullin took issue with the Court's requirement that the allegations of sexual abuse against the father be proven by clear and convincing evidence as opposed to by a preponderance, but nothing in either dissent suggests that the allegations of sexual abuse in that case need not be proven at all. See id. at 270, 647 A.2d at 726 (Allen, C.J., dissenting); id. at 276, 647 A.2d at 730 (Morse, J., dissenting). In analyzing whether due process required that the sexual abuse allegations against the father be proven by a preponderance of the evidence or by clear and convincing evidence, both the majority and Chief Justice Allen's dissent applied the framework outlined by the United States Supreme Court in Mathews v. Eldridge, 424 U.S. 319 (1976). See Mullin, 162 Vt. at 265-267, 647 A.2d at 722-724; id. at 271-276, 647 A.2d at 726-729 (Allen, C.J., dissenting). Implicit in both opinions was that due process did not permit termination of the father's relationship with his children absent proof of the allegations against him; the only point of contention was whether that proof would be by a preponderance of the evidence or by clear and convincing evidence. In arguing that a finding of sexual abuse by a preponderance of the evidence was sufficient to support the trial court's order, Chief Justice Allen emphasized, "Proving sexual abuse by any standard poses a formidable task; proof by a preponderance of the evidence should not be equated with mere allegation." Id. at 274, 647 A.2d at 728-29 (Allen, C.J., dissenting). The fact that the allegations of sexual abuse had been proven by a preponderance of the evidence was critical to Chief Justice Allen's analysis, as it required the court to consider the children's interests in personal safety and

18

freedom from abuse as separate interests in the due process analysis. Id. at 273, 647 A.2d at 727 (Allen, C.J., dissenting).

¶ 40. The upshot of these decisions is that due process, pursuant to both the Vermont and United States Constitutions, does not permit the family division to effectively cut off a child's relationship with a parent without a showing by clear and convincing evidence that the parent whose rights are terminated has engaged in some conduct, or has some characteristics, that render the parent unfit to parent the child. A finding, even by clear and convincing evidence, that effective termination of a parent-child relationship is in the child's best interests pursuant to the best-interest factors in 15 V.S.A. § 665 is insufficient to support an order that essentially terminates a parent's rights. See DeSantis v. Pegues, 2011 VT 114, ¶ 31, 190 Vt. 457, 35 A.3d 152 (holding in context of interim custody order in divorce that "as a matter of due process, a court must find evidence of sexual abuse by clear and convincing evidence in order to terminate all contact between a parent and child" (citing Mullin, 162 Vt. at 263, 647 A.2d at 721)).

¶ 41. The trial court's findings in this case make it clear that mother is not by any measure unfit to parent. The court emphasizes at the outset that "at no time has it ever been established by any credible evidence that [the child] was ever sexually abused" by his mother or her prior partner. The court finds that none of the allegations of abuse "have any foundation in fact, whatsoever." Rather, the court concludes that the child's beliefs concerning his mother have sprung "from nothing less than hysteria." In fact, the court states, "[w]e have no doubt that but for the negativity his father and stepmother have marinated this child in since May of 2012, [the child's] natural love and affection for his mother would likely return if he were reunited with her." Although the trial court applies the clear and convincing evidence standard to the findings it makes, it has made no findings suggesting that mother is unfit, has neglected or abused the child, or has engaged in conduct that would warrant a termination of her parental rights.

¶ 42. Ironically, the only findings in this case relating to neglect or abuse implicate father, not mother. The trial court was "thoroughly convinced that father and stepmother are solely responsible for [the child's] trauma and his utter estrangement from his mother." The court finds that "father and stepmother broke all the basic rules of coparenting, and, in doing so, they obliterated this child's relationship with his mother." The trial court finds that a return to regular contact with mother would not be problematic on account of mother's conduct—the risk that underlies the trial court's order is that father and stepmother would be unable to refrain from further alienating behavior and that further contact <u>with them</u> after resuming a relationship with his mother would "perpetuate [the child's] exposure to their egregious behavior." As this Court has previously observed, "a sustained course of conduct by one parent designed to interfere in the child's relationship with the other casts serious doubt upon the fitness of the offending party to be the custodial parent." <u>Renaud v. Renaud</u>, 168 Vt. 306, 309, 721 A.2d 463, 466 (1998).

¶ 43. Given the state and federal constitutional interests at stake, the trial court's findings in this case could not support an order that effectively terminates mother's parental contact with the child on a long-term basis.

¶ 44. I am willing to affirm the trial court's order in this case as a temporary way station. The trial court in this case thoughtfully struggled with an impossible situation. The court constructed a plan designed to relieve the immediate pressure on the child, to put into place services for father and child, and to reinstate formal efforts to reestablish child's relationship with his mother. The goal of the court's order is to address the immediate psychological challenges the child is facing, establish a framework for rebuilding the relationship with his mother that has been destroyed by father and stepmother, and avoid the immediate disruption that would result from a change in physical rights and responsibilities. These goals are consistent with the court's statutory mandate, as well as the constitutional imperatives identified above. See 15 V.S.A. § 650 ("The legislature finds and declares as public policy that after

20

parents have separated or dissolved their civil marriage, it is in the best interests of their minor child to have the opportunity for maximum continuing physical and emotional contact with both parents, unless direct physical harm or significant emotional harm to the child or a parent is likely to result from such contact.").

¶ 45.     By all appearances, this wrenching situation is far from over, and the next chapter is close at hand.  The trial court ordered that on or before August 16, 2016, unless the child has already begun routine visits with his mother as a result of the therapy ordered by the court, the child shall recommence treatment with a specified therapist with a goal towards reunification with his mother.  Notwithstanding this order, and notwithstanding the trial court's findings that father and stepmother have victimized this child by "marinating" him in negativity toward mother, at oral argument, father's counsel continued to question whether resumption of contact with mother will prove to be in the child's best interests, and held out the possibility that evidence may yet emerge to prove the allegations decisively rejected by the trial court.  Given father's posture on appeal, and the trial court's findings as to the risk that the child will not be able to withstand father's and stepmother's further alienating behavior, I'm deeply skeptical that the trial court's hopes of reestablishing the child's relationship with his mother will bear fruit as long as the child lives with father and stepmother.  Despite its hopes to the contrary, the trial court appears to share this skepticism.  While the current order seeks to strike a balance between the child's immediate need for stability in his present living situation and his countervailing need for a healthy relationship with his mother untainted by false allegations and imagined harms, it is not a long-term solution.

¶ 46.     Indeed, this Court has previously held, as a matter of statutory interpretation and policy rather than constitutional imperative, that "[a] parent who willfully alienates a child from the other parent may not be awarded custody based on that alienation."  Begins v. Begins, 168 Vt. 298, 302, 721 A.2d 469, 472 (1998) (quotation omitted).  In Begins, the trial court awarded

21

the father physical rights and responsibilities of the parties' sons on account of their estrangement from their mother. The trial court found that the most significant factor fueling that estrangement between mother and sons was "a constant poisoning of the relationship by father." Id. at 300, 721 A.2d at 471. Although the trial court acknowledged that the father did not deserve to be awarded custody of the children, it concluded that "he has effectively done so." Id. This Court reversed, explaining:

> Although obviously well intended, the court's decision effectively condoned a parent's willful alienation of a child from the other parent. Its ruling sends the unacceptable message that others might, with impunity, engage in similar misconduct. Left undisturbed, the court's decision would nullify the principle that the best interests of the child are furthered through a healthy and loving relationship with both parents.

Id. at 302, 721 A.2d at 472.

¶ 47. For the above reasons, while I concur in the court's decision concerning the specific, time-limited order before us, I want to state clearly that my concurrence does not signal that I believe that the Vermont and United States constitutions would tolerate an indefinite continuation of the effective suspension of mother's parental rights reflected in the present order.

_____
Associate Justice

22