REIBER, C.J.
¶ 1. Mother appeals pro se from the trial court's denial of her motion to modify parental rights and responsibilities for son L.C. Although the court found that mother had shown a real, substantial, and unanticipated change in circumstances, it concluded that transferring custody to mother at this juncture was not in L.C.'s best interests. Mother argues that the court's findings do not support its conclusion, particularly given its determination that father and stepmother are not credible witnesses. As set forth below, we conclude that the court acted within its discretion in assessing L.C.'s best interests and we therefore affirm its decision. We emphasize, however, that the trial court has now set a clear benchmark for father and stepmother's behavior, and any further attempts at alienation may well affect the best-interest analysis and warrant a change in custody. See Miller-Jenkins v. Miller-Jenkins, 2010 VT 98, ¶ 25, 189 Vt. 518, 12 A.3d 768 (mem.) ("One parent's attempts to hamper the other's parent-child relationship ... typically demonstrates a lack of regard for the child's best interests and suggests that a transfer of custody may well be in the child's best interests.").
¶ 2. Mother also challenges the court's denial of her request for attorney's fees. We agree with mother that she is entitled to such fees given father's egregious and ongoing effort to alienate her from L.C., which prompted the action at issue here. We therefore reverse the court's denial of *182 mother's request for attorney's fees and remand for additional proceedings on this issue.
¶ 3. Finally, mother informed the Court during oral argument that on March 10, 2017, father moved to suspend her visitation with L.C. The trial court suspended mother's visitation on March 10, 2017, and mother indicates that she has had no parent-child contact since that date, including during the week of April vacation that the trial court had previously ordered. Given the history of this case, any delays in the process of reestablishing mother's relationship with the child are profoundly concerning. If the trial court has not yet done so, we direct the court to hold a hearing on resuming mother's parent-child contact within fourteen days of the date of this decision and to consider awarding additional contact to make up for the time lost due to father's actions.
I. Prior Rulings
¶ 4. We recently recounted in detail the long and heartbreaking history of this case. See Knutsen v. Cegalis, 2016 VT 2, 201 Vt. 138, 137 A.3d 734. We do not repeat that history here. Essentially, since 2012, when L.C. was five years old, father and stepmother have been "waging war against mother and making allegations of abuse [against mother and her then-boyfriend] that were not true." Id. ¶ 19. Through their actions, father and stepmother deprived mother of any contact with L.C. for many years and "destroyed the child's formerly good relationship with mother." Id. ¶¶ 19, 21. The court found father and stepmother solely responsible for L.C.'s trauma and for his utter estrangement from mother. Id. Simply put, father and stepmother have "impeded reunification" with mother "every step of the way."[1] Id. ¶ 25.
¶ 5. Despite father and stepmother's egregious behavior, the trial court has thus far declined to modify parental rights and responsibilities for the child. In a February 2015 order, the court concluded that "it could not simply order the child to live with mother, even though it was 'the right thing to do.' " Id. ¶ 21. Instead, the court considered the statutory best-interest factors, and found "the quality of the child's present adjustment to his home, school, and community, and the potential effect of any change" controlling. Id. In its February 2015 ruling, the court determined that transferring custody to mother-when the child had not visited mother's new home, did not know her new community, and would have to attend a new school-would cause "a 'violent dislocation' cautioned against by this Court in deciding modification of parental rights cases." Id. Given L.C.'s then-existing mental health needs, the court also suspended efforts to reunify L.C. with mother, with certain conditions. Mother was denied any parent-child contact, with the exception of letters to be mailed directly to L.C.'s attorney. Father was directed to "immediately obtain a child-trauma therapist, and to refrain from interfering, or allowing stepmother to interfere, with the child's therapy."[2]
*183 Id. ¶ 24. The court ordered that on or before L.C.'s eleventh birthday in August 2016, L.C. must recommence office visits with a therapist, with a goal toward reunification with mother. Id.
¶ 6. We upheld this decision on appeal, although we agreed that "father and stepmother have traumatized the child and completely alienated him from his mother." Id. ¶ 28. We acknowledged mother's justifiable "frustration at father's and stepmother's interference in the reunification process since at least 2013 and the distressing unfairness of being denied contact with her child for more than three years based wholly upon false accusations." Id. ¶ 34. Notwithstanding our concerns, we concluded that the trial court had properly focused its analysis on L.C.'s best interests, and we affirmed its decision "not because the father and stepmother are correct in their accusations, or to reward or endorse the course of conduct in which they have engaged, but because the trial court's judgment regarding the best interests criteria was factually based and legally correct." Id. ¶ 33. We emphasized that mother was "not without recourse should father and stepmother continue to interfere with her attempts at reunification or should they defy the trial court's orders." Id. ¶ 34.
II. Current Ruling
A. Change in Circumstances
¶ 7. It is apparent that during the pendency of the 2015 appeal, father and stepmother continued to wage war against mother. In October 2015, mother filed the emergency motion to modify at issue here. She argued that father continued to deliberately and repeatedly undermine and defy the court's orders. The trial court agreed. At a September 2016 hearing, the court concluded that father's serious and blatant violations of its prior order constituted a real, substantial, and unanticipated change of circumstances. As the court explained, it had expressly prohibited the parties from publishing L.C.'s medical records to any third person, yet stepmother had provided L.C.'s private medical information-a trauma therapy report-to the media, which father had at least "tacitly condoned," the trial court said. Father's attorney also submitted this same report as an exhibit to a motion to stay father's deposition in a separate civil suit that mother had filed. The court observed that father did not repudiate his attorney's actions or attempt to rescind this filing.
¶ 8. Father also violated the clear prohibition against interfering with L.C.'s therapy. Father wrote several letters to L.C.'s trauma therapist at the inception of therapy, attempting to sway her opinion. He continued his effort to have mother "prosecuted," telling the therapist that providing the trauma therapy report to L.C.'s attorney "may finally result in a real investigation taking place, rather than a court-ordered cover up." Father also informed the therapist that "people are currently investigating this case" and suggested that the therapist "file a report and document it by certified return receipt."
¶ 9. The court considered father's violations highly significant. It explained that L.C.'s therapy had been recommended by the reunification therapist, and it was critically important to L.C.'s health and well-being and to his ability to move forward in his relationship with mother. The court found father's violations so fundamental to *184 the heart of the case that they could not be overstated.
B. Best Interests
¶ 10. At the best-interest hearings that followed, mother offered the expert testimony of clinical psychologist Dr. Eric Mart. Dr. Mart had not interviewed L.C., father, or stepmother, but he had reviewed other information provided to him, including the court's prior rulings. He opined that there were three ways forward: leave L.C. where he was and there would be no relationship with mother; transfer custody to mother; or place L.C. in a group home or similar setting. Dr. Mart did not offer any opinion on what course of action would serve L.C.'s best interests. He did caution, however, that reunification therapy would not be productive if a family member continued to believe, as father does here, that the other parent had abused the child. The court indicated that it was not particularly swayed one way or the other by Dr. Mart's testimony, and it did not rely on his testimony in making its decision.
¶ 11. Father and stepmother testified at the hearing as well and they continued to express their belief that mother abused L.C. Nonetheless, father, and to a much lesser extent stepmother, professed to a change-of-heart as to reunifying L.C. with mother. They testified that the parties should be able to work together and that mother deserved to have a role in L.C.'s life. Father indicated that he now supported reunification therapy because he had seen a change in L.C. Mother testified that she did not believe father's and stepmother's "conversion," and feared that she was being set up yet again.
¶ 12. The court found mother's concern and frustration understandable, and like mother, it questioned father's and stepmother's sincerity. Father and stepmother credited L.C.'s therapy in the summer of 2015 as the reason for their newfound willingness to have L.C. reunify with mother. That therapy had occurred seventeen months earlier. In the fall and winter of 2015, mother was not permitted to even send a card or letter to L.C., despite a court order to the contrary. In August 2016, after L.C.'s therapy was completed, stepmother wrote to the United States Attorney for the District of Vermont and provided a list of deplorable things that she and father accused mother of doing to L.C. If stepmother actually supported reunification, the court explained, it seemed very unlikely that she would write a letter containing such flagrant falsehoods. In August 2016, stepmother released L.C.'s confidential psychological records to the press, claiming a First Amendment right to do so. Stepmother also stated in a deposition that the Chittenden Unit for Special Investigations had engaged in a coverup. It was against this backdrop that the court was now expected to believe father and stepmother's testimony that they supported reunification.
¶ 13. The court found that father and stepmother's actions spoke louder than their words. It could not emphasize strongly enough that neither had any credibility with the court. The court only believed that L.C. was doing well in school, for example, because of his report cards and his teacher's testimony. The court explained that not once prior to the current hearing had father made any overture to mother to recommence contact or therapy or taken any other action approaching reunification. Like mother, the court viewed the stated change-of-heart very skeptically, and remained very concerned that father and stepmother would continue to speak and behave in ways that perpetuated the severance of the relationship between L.C. and his mother.
*185 ¶ 14. The court acknowledged that this was a very difficult case. Applying the statutory best-interest factors, it concluded that father should retain custody of L.C. As in its earlier ruling, the court's decision rested largely on L.C.'s adjustment to his present housing, school, and community. Evaluating L.C.'s interests as the paramount concern, it concluded that L.C. was happy, well-behaved, and deeply involved in his school. The court found that the stability of this environment and L.C.'s admirable growth defined him as a young man, and that removing him from this environment was not in his best interests. Mother lived in Burlington, and transferring custody to her would mean that L.C. had to attend a new school. The court also expressed concern about the psychological effect that a transfer of custody might have on L.C. after years of estrangement from mother, even though mother bore no responsibility for that estrangement. L.C. had a close bond with father but not with mother, again, because of false allegations made and relentlessly pursued by father and stepmother. L.C. also had a bond with stepmother, although the court viewed her words and actions very negatively.
¶ 15. In reaching its decision, the court recognized that father and stepmother had demonstrated no ability or disposition to foster a positive relationship between L.C. and mother. The court was "healthily skeptical" of their professed change-of-heart. It noted that mother was understandably very bitter, and that it would be difficult for her not to let that bitterness affect her ability to foster a positive relationship between L.C. and father. The court cited father's testimony that mother deserved to have a role in L.C.'s life. It found that these were the circumstances that existed as of the date of the final hearing, and the court relied a great deal on father's and stepmother's stated positions as a basis for its ruling. The court emphasized, however, that:
[a]ny deviation from father and stepmother's stated position, which would potentially include, but not be limited to, derogatory remarks to or about mother to any service provider going forward; any attempt to publish L.C.'s private therapeutic records; any effort whatsoever to have mother investigated by any governmental entity pertaining to any allegations made to date, or any statements, comments, words, remarks, or actions made or done to L.C. or [in] his presence or [to third] persons with the intention of influencing L.C. in any way against having contact with his mother could, in fact, be considered a real, substantial, and unanticipated change in circumstances.
¶ 16. As part of its order, the court set forth a specific parent-child contact schedule to begin in January 2017. In the interim, the court ordered L.C. to have therapy sessions at least once a week unless otherwise recommended by his therapist. Father was required to pay for the therapy and to transport L.C. to and from therapy; stepmother was prohibited from accompanying them. The court again prohibited father and stepmother from interfering with, impeding, or impairing L.C.'s participation in therapy in any manner whatsoever, and it imposed a protective order on L.C.'s therapeutic records. As discussed in greater detail below, mother subsequently requested attorney's fees and costs, and the court denied her request. Mother appeals from these orders.
III. Arguments on Appeal
¶ 17. Mother expresses understandable frustration over what has occurred in this case. She contends that father and stepmother continue to engage in the same type of egregious behavior as before, without consequence. Mother maintains that *186 the court's conclusion as to L.C.'s best interests is not supported by its findings and that the result is clearly unreasonable in light of the evidence. Mother notes that the court has repeatedly found father and stepmother to lack any credibility and questions why it credited their last minute "conversion" at the best-interest hearing. Mother argues that the court should have instead credited her expert witness and granted her motion to modify.
¶ 18. Our review of the court's decision is deferential. "The trial court has broad discretion in determining what course of action is in a child's best interests," and "[i]t is for the trial court, not this Court, to evaluate the credibility of witnesses and weigh the persuasiveness of the evidence." Id. ¶ 29. We will uphold the court's findings "unless clearly erroneous," and its legal conclusions will stand "where supported by the findings." Id.
¶ 19. As the trial court recognized, this is a very difficult case. In deciding which course of action was appropriate, the trial court properly focused its analysis on L.C.'s best interests as required by 15 V.S.A. § 665(b). See, e.g., Begins v. Begins, 168 Vt. 298, 301, 721 A.2d 469, 472 (1998) ("The court's paramount consideration in awarding parental rights and responsibilities is the best interests of the child." (citing Bissonette v. Gambrel, 152 Vt. 67, 70, 564 A.2d 600, 602 (1989) ); 15 V.S.A. § 665(b) ); see also Principles of the L. of Fam. Dissolution § 2.02, cmt. b & § 2.02 Reporter's Notes, cmt. b (2002) (explaining that "priority of the child's interests over those of the competing adults is premised on the assumption that when a family breaks up, children are usually the most vulnerable parties and thus most in need of the law's protection," and "[c]ases consistently express a priority in favor of protecting the interests of children over the interests of their parents or concern about the equities between them"). The court considered the factors set forth by statute, and concluded that they weighed in favor of father retaining custody of L.C. See Kasper v. Kasper, 2007 VT 2, ¶ 5, 181 Vt. 562, 917 A.2d 463 (mem.) (recognizing trial court's broad discretion in evaluating statutory best-interest factors and stating that "[w]here the family court's award of custody reflects its reasoned judgment in light of the record evidence, its decision may not be disturbed.").
¶ 20. The court explained why it did not find Dr. Mart's testimony persuasive-he never met personally with L.C. and confined his approach to a record review-and in fact, Dr. Mart did not offer any opinion as to what course of action would be in L.C.'s best interests. We do not reweigh the evidence or reassess the credibility of witnesses on appeal. See Knutsen, 2016 VT 2, ¶ 29, 201 Vt. 138, 137 A.3d 734. As set forth above, the critical factors for the court were L.C.'s engagement in his local school and community and his strong bond with father.
¶ 21. The court acknowledged that father's and stepmother's actions laid the groundwork for certain findings, such as the child's current lack of a bond with mother and his strong bond with father, as well as the possible psychological effect that a change in custody would have on L.C. We have held that "[a] parent who willfully alienates a child from the other parent may not be awarded custody based on that alienation" because that would "send[ ] the unacceptable message that others might, with impunity, engage in similar misconduct." Begins, 168 Vt. at 302, 721 A.2d at 472 (quotation omitted). Certainly, this case shares many similarities with Begins. At the same time, however, the trial court did not rest its decision solely on the results of father's efforts to alienate L.C. from mother. The fact that *187 L.C. was healthy and happy and deeply involved in his school and community were also important factors.
¶ 22. The court also chose to rely on father's and stepmother's assertion that, going forward, they would act in L.C.'s best interests and promote his reunification with mother. While the trial court expressly found father and stepmother not credible in all other respects and detailed reasons why their last-minute conversion similarly should not be believed, it nonetheless relied on this testimony as reflecting the "circumstances that existed as of the date of the final hearing." We defer to the trial court's judgment because it is in the best position to assess the credibility of witnesses and the weight to be given to evidence. See, e.g., Kanaan v. Kanaan, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995) (trial court's findings accorded "wide deference on review" because court is "in a unique position to assess" credibility of witnesses and weight of evidence). Given the child's connection to his current community, the court appears to have essentially provided father with a final opportunity to modify his behavior by including a strict warning about the consequences of any deviation from his testimonial promise to promote L.C.'s reunification with mother. Of course, as mother points out, the trial court has made such warnings before, as has this Court, with no apparent effect. The fact that father has since moved to suspend mother's parent-child contact does not speak well of his ability to keep his promise. At this juncture, however, and based on the evidence that the trial court had before it at the time, we conclude that the trial court's assessment of L.C.'s best interests is "factually based and legally correct." Knutsen, 2016 VT 2, ¶ 33, 201 Vt. 138, 137 A.3d 734. Father and stepmother cannot continue to engage in alienating behavior, however, without consequence. Mother has a constitutional right to parent L.C., and it is beyond dispute that L.C.'s best interests "are furthered through a healthy and loving relationship with both parents." Id. ¶ 46 (Robinson, J., concurring) (quotation omitted).
IV. Attorney's Fees
¶ 23. Finally, we turn to mother's request for attorney's fees. Mother asked the trial court to order father to pay her court costs, witness fees, and attorney's fees associated with her emergency motion to modify custody. She maintained that her motion emanated from father's contemptuous, willful, and repeated disobedience of the court's orders, and she argued that she should not be made to bear the burden of father's noncompliance. Father opposed the motion. He argued that it was not equitable to grant mother's request because he was responsible for the costs of raising L.C., including therapy costs, and he was also responding to a civil action that mother had brought against him and stepmother. If the court deemed it appropriate to issue an order awarding attorney's fees, father asked for a hearing pertaining to the parties' financial circumstances, which he asserted had changed since the court's prior award of attorney's fees to mother. Father later argued that he should not have to pay the costs of certain witnesses provided by mother, including Dr. Mart, and he maintained that each party bear his or her own attorney's fees in preparation for and representation at the best-interest hearing.
¶ 24. The court denied mother's request. It explained that in its February 2015 order it had allocated fees and costs, and was perhaps unduly optimistic that the litigation would have ended, or at least scaled back significantly, as a result. The most recent round of litigation included production-of-records issues, protective order issues, and trial preparation and attendance.
*188 Mother prevailed at the change-in-circumstances hearing, but she did not prevail at the best-interest hearing, at least in terms of a change in L.C.'s legal and physical custody. The court noted that father had proposed a partial settlement, which mother had rejected. The court found it fair, in this narrow confine, that each party bear his or her own fees and costs from September 2015 to the conclusion of this round of litigation. Mother moved for reconsideration, and the court denied her request.
¶ 25. Mother argues on appeal that the court abused its discretion in denying her request. We agree. See Mullin v. Phelps, 162 Vt. 250, 268, 647 A.2d 714, 725 (1994) ("In proceedings dealing with motions to modify parental rights and responsibilities, the trial court may award attorney's fees in its discretion."). "The assessment of such fees is proper where justice and equity so indicate." Turner v. Turner, 2004 VT 5, ¶ 9, 176 Vt. 588, 844 A.2d 764 (mem.) (quotation omitted). As we explained in Mullin, "[t]he power to allocate expenses among the parties mitigates the potentially onerous financial burden that can befall one who seeks to promote a child's best interests," and "[i]n fashioning an award, the court's primary consideration is the financial resources of the parties." 162 Vt. at 268-69, 647 A.2d at 725 ; see also Turner, 2004 VT 5, ¶ 9, 176 Vt. 588, 844 A.2d 764 (similarly stating that "primary consideration in awarding attorney's fees is the ability of the supporting party to pay and the financial needs of the party receiving the award").
¶ 26. The court erroneously focused on whether mother had "prevailed" at the best-interest hearing. Father blatantly and repeatedly violated the court's orders to L.C.'s detriment, prompting mother's motion. Father has been engaging in similar conduct for almost four years. Justice and equity plainly support an award of fees and costs to mother. The court's findings reflect, moreover, that father has significantly more financial resources than mother. Father is a veterinarian who lives in a luxurious home on 425 acres in Castleton, Vermont, and he enjoys an above average standard of living. It is not clear where mother is currently living, but she works several jobs and it is apparent that she has significantly fewer financial resources than father. See Turner, 2004 VT 5, ¶ 9, 176 Vt. 588, 844 A.2d 764 (recognizing that because parties' financial circumstances are almost always involved in divorce and similar actions, this obviates need for hearing, or taking of particular evidence, on question of awarding attorney's fees, and "[i]n the usual, and vast majority of, cases such allowance borders on judicial routine, and is supported by evidence bearing on the circumstances of the parties generally" (quotation omitted)).
¶ 27. Certainly, the fact that father is paying for the child's therapy is not a persuasive reason to deny mother's request for fees as it was father and stepmother who traumatized the child and alienated him from mother, leading to the need for treatment in the first place. We are equally unpersuaded by father's assertion that fees should be denied because he is a defendant in a civil suit. Finally, we reject the suggestion that mother was somehow at fault for her reluctance to enter into a stipulation with father, offered just before the best-interest hearing, that father would pay for L.C.'s therapy. As the court found in its decision, mother was justifiably suspicious of father's offer, particularly as he had used therapists against her in the past.
¶ 28. Mother plainly filed her motion to promote L.C.'s best interests and to stop father's ongoing egregious violations of existing court orders. Mother should not have to bear the cost of enforcing her *189 constitutional right to parent L.C. under these circumstances. Fundamental fairness requires that father pay mother's attorney's fees and costs. We therefore reverse and remand the court's decision on this issue.
The court's denial of mother's motion to modify is affirmed. Its denial of mother's request for attorney's fees is reversed and remanded for additional proceedings. Within fourteen days of the date of this order, the court shall hold a hearing concerning mother's right to parent-child contact with L.C.

We recognize that "reunification" is a term of art in the context of cases involving children in need of supervision who have been removed from a parent's custody. In this opinion, we use the term in its colloquial sense; it means reestablishing a meaningful parent-child relationship and contact between mother and child.

The child's attorney did not in fact provide mother's letters to L.C. nor did she tell mother that she was withholding the letters from L.C., leading the court to issue an entry order that it expected compliance with its order. The court also expressed grave concern over a comment by L.C.'s therapist that L.C. would view the letters as "another attack" by mother. The court reiterated that L.C. had not been attacked in any way by mother, but rather that father and stepmother had engaged in a concerted effort to estrange L.C. from mother. It is evident that the trauma to be addressed through this therapy was the trauma inflicted on L.C. by father and stepmother, not "trauma" from alleged sexual abuse by mother, which had no basis in fact.