### Gina Harris v. Frank Harris

[647 A.2d 309]

No. 93-077

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed June 3, 1994

*Paul D. Jarvis* of *Jarvis and Kaplan,* Burlington, for Plaintiff-Appellant.

*Stephen S. Blodgett* of *Blodgett, Watts & Volk, P.C.,* Burlington, for Defendant-Appellee.

**Morse, J.** Plaintiff wife appeals a divorce judgment, arguing that the court abused its discretion by awarding custody of the parties' son to defendant father, thereby separating their two children; by awarding her only $10,000 of the marital property; and by declining to award her maintenance. We affirm the custody determination, but reverse and remand the property divison and maintenance rulings.

The parties had been married seven years when they separated in January 1992. Under temporary orders, the mother lived in the marital home in Grand Isle with both children from January to May 1992, and the husband lived in the marital home with the parties' son, Cole, from May to the final divorce hearing, four months later. The parties' daughter, Marissa, moved from the home with her mother in May 1992, eventually to a condominium in Williston. At the time of trial on September 11, 1992, Cole was just over five-and-one-half years old and Marissa was one day shy of her second birthday.

Following the hearing, the family court ordered that Cole remain in his father's custody and that Marissa remain in her mother's custody, with visitation by both children on alternate weekends. The father was awarded the marital home. The court ordered the father to pay the mother, within one year of the judgment, $10,000 as her share of the marital assets, and it denied the mother's request for maintenance.

## I.

The mother first argues that the court abused its discretion by awarding custody of Cole to the father, thereby separating the children. She contends the evidence does not support the court's finding that neither party was Cole's primary care giver. In her view, the court erroneously gave the father custody of Cole based on the paternal grandmother's prior and continuing care for the boy. She argues the evidence showed that she was the primary care giver, which required the court to award her custody of both children.

Finally, she contends that the court's findings failed to provide an adequate rationale for its custody award.

We agree with the mother that the court's findings and conclusions regarding who was the primary care provider are equivocal. At one point, the court found that it was unable to determine who Cole's primary care giver was because his care had been "split" between the mother, the father, and the paternal grandmother. At another point, the court found that the father "participated in the care of the children but the care of Cole was usually divided between [his mother] and [his father's] mother," and at yet another point it concludes that "Cole's child care was divided between his mother and his grandmother."

Our review of the record indicates that the latter statement is the most accurate one. Before the separation, the mother cared for the children from the time they got up until noon and again from late afternoon until bedtime; the grandmother often cared for the children from noon until four o'clock in the afternoon, when the father came home from work. Thus, this was a "traditional" marriage, in which the father worked and the mother stayed home and took care of the children. After the mother moved from the marital home with Marissa, most of Cole's basic physical needs were provided by the paternal grandmother, who conducts a registered day care facility in her house, which is located only seventy-five yards from the marital home. She dressed Cole and fed him breakfast after the father went to work. She cared for him during the day until the father got home. More often than not, she served the dinner for both the father and Cole. Frequently, Cole slept at her house. In short, although the testimony indicated the father was very close to his son—evidenced for the most part by their shared interest in fishing, hunting, and softball—the father had only a limited role in providing for Cole's basic needs, even after the mother left the marital home.

Although the grandmother played a significant role in caring for both children during the parties' marriage, and for Cole after the parties' separation, we conclude, focusing on all periods of the children's lives, *Nickerson v. Nickerson*, 158 Vt. 85, 90–91, 605 A.2d 1331, 1334 (1992), that the court erred in finding that it was unable to determine who was the primary care giver for Cole. The evidence leaves no doubt that the mother was his primary care provider for his entire life until the last four months before the final divorce hearing.

The court's erroneous finding does not require reversal of the custody award, however. The court's error lies more in its failure to

attach the appropriate label than to comprehend the relevant circumstances. Indeed, the court's specific assessment of who provided what care for the children during particular times of the day was accurate. The court acknowledged that the mother and paternal grandmother shared the child-care duties, and that the father's role in that regard was minimal. We must determine, then, whether the mother's role in caring for the children entitled her to custody of Cole.

■■ "[T]he quality of the child's relationship with the primary care provider, if appropriate given the child's age and development," is one of the nonexclusive statutory factors the court must consider in making a custody award. 15 V.S.A. § 665(b)(6). While we have recognized that this factor is entitled to great weight, we have declined to adopt "a rule that the primary custodian will be awarded custody as long as the parent is fit." *Harris v. Harris*, 149 Vt. 410, 418, 546 A.2d 208, 214 (1988); see *Peckham v. Peckham*, 149 Vt. 388, 390, 543 A.2d 267, 268 (1988) ("fact that one party acted as primary caretaker is not determinative"). Rather, § 665(b)(6) "directs the court to give some weight to continuation of the primary custodian with the weight to be determined by the quality of the relationship." *Harris v. Harris*, 149 Vt. at 418, 546 A.2d at 214. The court must consider whether breaking, or even loosening, the bond with the primary parent will be detrimental to the child's physical and mental well-being or to the child's need for a stable and secure environment. See 15 V.S.A. § 665 (court shall make custody award that serves best interests of child); *Maxfield v. Maxfield*, 452 N.W.2d 219, 223 (Minn. 1990) (best-interest analysis examines bond between young child and primary parent as it bears on desirability of maintaining continuity). Thus, the weight to be accorded to the primary-custodian factor depends on "the likely effect of the change of custodian on the child." *Harris*, 149 Vt. at 418–19, 546 A.2d at 214.

This is precisely the type of evidence the court relied on in determining that Cole should remain with his father. The court questioned the quality of the time Cole spent with his mother, noting that he was usually inside the house watching television, and, at times, when he was outside, he was left alone. The court also noted that when Cole resided with his mother between January and May 1992, he frequently expressed a longing to be with this father, and it concluded, based on the testimony of several witnesses, that the boy's emotional state had significantly improved since he resumed living with his father. The court emphasized the close relationship Cole and his father had, noting that they both enjoyed being outside playing

ball or scouting for deer. The court also pointed out that, to a greater extent than Marissa because of his sister's age, Cole had a network of friends and family in the Grand Isle area, and that he was attached to the community and the marital home. Given these findings, which have support in the record, we conclude that the court's failure to identify the mother as the primary care provider does not require reversal.

■ The court also made several findings concerning the paternal grandmother, stating that Cole was extremely close to her and that she played a significant role in his life and development. The mother argues that the court, in effect, chose the grandmother rather than her as Cole's custodial parent. We disagree with that assessment. Though many of Cole's basic physical needs had been provided by the grandmother, the court found that the father spent a significant amount of time with Cole, and that the two engaged in a variety of activities constructive to Cole's emotional development. The father should not be disadvantaged for his fortune in having a mother who operates a day care facility nearby and who is willing and eager to care for his son while he is at work.

■■ With little discussion, the mother argues that the court erred by separating the children. Neither statutory nor case law in Vermont has ever directly addressed the appropriateness of separating siblings in custody cases. In general, most courts have concluded that public policy favors keeping siblings together in the same home. E.g., *Sefkow v. Sefkow*, 427 N.W.2d 203, 215 (Minn. 1988); *Andersen v. Andersen*, 399 N.W.2d 363, 365 (S.D. 1987); see Annotation, *Child Custody: Separating Children by Custody Awards to Different Parents—Post-1975 Cases*, 67 A.L.R.4th 354, 360 (1989). The fundamental reason behind this policy is the assumption that separation of the children from each other will further weaken familial ties that have already been damaged by the parents' divorce, and thus will endanger the children's emotional well-being. See Annotation, *supra*, at 360; *Pennington v. Pennington*, 711 P.2d 254, 256 (Utah 1985) (suggesting that where bonding between siblings had occurred, siblings should not be forced to face "double emotional trauma" caused by cutting bonds with each other as well as with parent). The potential for future bonding between siblings who are very young at the time of their parents' separation also militates in favor of keeping the children together.

Some courts have gone so far as to hold that siblings should not be separated absent "compelling" or "exceptional" circumstances, but

even those courts acknowledge that the ultimate determining factor is the "best interests" of the children. See *Wallace v. Wallace*, 420 So. 2d 1326, 1328 (La. Ct. App. 1982) (courts seek to avoid separation of siblings, but "paramount question" is what would serve best interests of children); *Doren v. Doren*, 431 N.W.2d 558, 561 (Minn. Ct. App. 1988) (split custody is not favored, but it may be appropriate where other factors outweigh need for siblings to reside together); *Atwood v. Atwood*, 664 S.W.2d 673, 674 (Mo. Ct. App. 1984) (children of divorced parents should not be separated absent exceptional circumstances, but trial court has power to decree separation if it is in best interests of children); *Bilodeau v. Bilodeau*, 557 N.Y.S.2d 471, 472 (App. Div. 1990) (while generally courts discourage separation of siblings, split custody decree is proper when best interests of each child lies with different parent); *M.D. v. B.D.*, 485 A.2d 813, 816–17 (Pa. Super. Ct. 1984) (although general rule is that siblings should not be separated absent compelling reasons, this policy is but one factor to be considered in determining children's best interests). Noting that deciding whether to separate children is not "susceptible to a precise formula," one court in a jurisdiction requiring "exceptional" circumstances to do so stated:

> Analysis of the cases in which this general rule is often reiterated discloses that rather than being exceptional, the circumstances considered in determining the propriety of an order separating siblings are simply those which are seen as being the least disruptive of intra-family relationships and the most conducive to the establishment and maintenance of a stable and nurturing environment during formative years.

*D.S.P. v. R.E.P.*, 800 S.W.2d 766, 769 (Mo. Ct. App. 1990).

We agree with this analysis, and hold that the family court should avoid separating siblings in custody or divorce proceedings unless the evidence indicates that the best interests of the children favor split custody. In determining whether split custody is in the children's best interests, the court should consider all relevant factors, including (1) the quality of the relationship that the siblings have established with each other and with each parent; (2) the age difference between siblings, and the existence or absence of common interests; (3) the geographic proximity of the separated or divorced parents, and the extent to which the children will have an opportunity to continue or develop their relationship through visitation; (4) the quality and circumstances of the custody arrangement at the time of

trial, and the likelihood that a different arrangement would be disruptive to the children; and (5) depending on the age of the children, their expressed preference as to custody. See *id.* at 770; see also *Miller v. Miller*, 444 N.W.2d 45, 47 (S.D. 1989) ("ages and relationships of the siblings are factors in determining whether compelling reasons exist to separate them"). This list of factors is not meant to be exhaustive, and none of the individual factors are meant to be controlling; rather, these and other relevant factors should be considered in order to determine the best interests of the children.

█  In this case, the court found that Cole was especially attached to his father and paternal grandmother, and that he had developed roots in the community in which his father resided. In contrast, the court found that Marissa was not exceptionally close to her father or her grandmother, and that, because of her age, she had not developed ties to the community in Grand Isle. The court also found that Cole's emotional state had improved since he left his mother's custody, that he was thriving in his father's custody, and that a change in his current situation would have a potentially disruptive effect on his life. Further, although only three and one-half years separated the children, the age difference is significant considering how young the children were at the time of separation. Because Cole and Marissa were separated from each other when Marissa was only about twenty months old, the separation had less potential to create further emotional trauma for the children regarding their parents' divorce. As for the children's relationship in the future, the court awarded liberal visitation to both parents.

Based upon the facts of this case and the court's findings, which are supported by the evidence, we conclude that the family court did not abuse its discretion in ordering split custody of the children. See *Nickerson*, 158 Vt. at 88, 605 A.2d at 1333 (trial court's broad discretion in custody matters will be disturbed only if erroneously exercised, or exercised upon unfounded considerations or to extent clearly unreasonable in light of evidence); cf. *Wallace*, 420 So. 2d at 1328 (split custody upheld where five-year-old boy was well-adjusted living with his father for fifteen months prior to final divorce hearing, and father resided in family home located next door to his parents, who helped look after child); *Sefkow*, 427 N.W.2d at 215 (split custody upheld where other factors—bonding to parent and stability of home environment—outweighed need for sisters to reside together); *Jobe v. Jobe*, 708 S.W.2d 322, 329 (Mo. Ct. App. 1986) (despite fact that children, ages five and three, got along well, and that father depended

on his parents to help care for his son while he worked, split custody upheld where boy's emotional state improved under father's care, there was a close bond between father and son, and liberal visitation was available); *Estes v. Estes*, 490 N.Y.S.2d 939, 940 (App. Div. 1985) (separation of siblings upheld where both children were doing well in split custody situation under temporary order, son was attached to father and daughter was attached to mother, and liberal visitation would be available).

We offer a final word of caution regarding the custody issue. In rendering its decision, the family court suggested that Cole had a natural affinity for his father, who teaches him "things a young boy should know." Within the context of all of the court's findings and conclusions, we do not interpret its comments in this regard as an indication it applied a preference that Cole remain with his father because he was a boy. If we did, we would be compelled to reverse the custody determination. See 15 V.S.A. § 665(c) ("court shall not apply a preference for one parent over the other because of the sex of the child [or] the sex of a parent"); cf. *Nickerson*, 158 Vt. at 98, 605 A.2d at 1338 (Dooley, J., dissenting) (citing law review article on point that purpose of primary caretaker preference, among other things, is to preserve gender-neutrality).

## II.

Next, the mother argues that the court abused its discretion in awarding her marital property in the amount of $10,000, which she claims is approximately 8% of the marital assets. The court gave the following explanation for its division of the parties' property:

> Both parties are young and healthy. Both have high school diplomas, but no higher education. While plaintiff was active as a homemaker during the marriage, and this may have increased defendant's earning power due to the practical experience he acquired, neither party contributed to the education or training of the other. Virtually all property acquired during the marriage came through the estate of defendant's father, including the marital home, the land it sits upon, the improvements made to the home financed by defendant's inheritance from his father, and the two notes defendant acquired through his father's estate. Cole, who will be residing with defendant, is extremely attached to and has always lived in the marital home. Finally, plaintiff did not bring any property into, nor acquire, receive, or inherit any property during the marriage.

The father contends that the court's award constitutes 12.6% of the marital assets, and argues that the wife is not entitled to more because (1) the $200 per month that he receives from two promissory notes valued at $20,000 was reported as income and factored into the calculation for his child support obligation; (2) it was clearly desirable for him to receive the marital home because he had custody of Cole, who had lived in the home his whole life, and because the property was acquired solely through the paternal grandfather; and (3) the mother acted cruelly toward the father after the separation by bringing her boyfriend to the marital home.

We agree with the mother that the court abused its discretion in awarding her only $10,000 in marital assets. The only tenable reason the court gave for its minimal award to the mother is that most of the parties' marital assets came from the paternal grandfather. While this is certainly a relevant factor, 15 V.S.A. § 751(b)(10) (court may consider party through whom property was acquired), it cannot, standing alone, justify the instant award. The marital home was the party's most valuable asset, with an equity value of approximately $100,000. The undisputed testimony was that the paternal grandfather gave the father land to build a home on in anticipation of the parties' marriage. The marital home, which was constructed shortly before the parties' were married, was financed by a mortgage that has been gradually reduced throughout the marriage. Both parties worked on the home before it was completed.

More importantly, other relevant factors weigh in favor of the mother receiving a larger share of the marital assets. Though this was not a particularly long marriage, the mother withdrew from the workforce for over seven years to care for the children and provide a home for the father, who gained earning power while he remained with the same company. Although the court acknowledged the mother's role as a homemaker, its division of the marital property does not reflect the value of these services. The mother's work in the home increased the father's earning power and his opportunity for future acquisition of assets. See 15 V.S.A. § 751(b)(5), (8), and (11). Further, the court did not examine the respective needs of the parties, see *id.* § 751(b)(6), or their future prospects based on their vocational skills and employability. See *id.* § 751(b)(4). While the father had a steady job that paid an annual salary of $36,000, the mother was just reentering the work force at $5.35 per hour. Moreover, because the father was awarded the marital home, the mother would have the

additional expense of maintaining a suitable place to live for herself and her daughter.

The property division here is strikingly similar to one that we overturned in *Dreves v. Dreves*, 160 Vt. 330, 334, 628 A.2d 558, 560 (1993). There, the wife received about 12.5% of the marital assets. The trial court's only explanation for its decision was that the marriage, like this one, lasted only seven years, and that the assets were originally attributable to the husband. We pointed out that the husband received a substantially larger share of the assets than the wife, despite the fact that the wife withdrew from the workforce for two years to serve as a homemaker, that the husband's earning capacity was considerably greater than the wife's, and that the wife would have to find a suitable place to live because she was not awarded the marital home. *Id.* Absent further findings from the trial court explaining such a large disparity in the amount of assets received by each party, we reversed the court's decision. *Id.* at 334–35, 628 A.2d at 560–61; see *Daitchman v. Daitchman*, 145 Vt. 145, 150, 483 A.2d 270, 273 (1984) (property division awarding five times more assets to wife than to husband requires closer examination to assure court considered all relevant factors); *Emmons v. Emmons*, 141 Vt. 508, 511, 450 A.2d 1113, 1115 (1982) (because property award is final and not subject to modification, wide discretion given to trial court must be tempered when findings are inadequate).

We reach the same result here. While the court should, and did, consider the impact of counting the monthly stream from the father's promissory notes as income for determining child support, the other factors noted by the father are irrelevant. The fact that the father had custody of Cole, who had always lived in the marital home, does not justify a reduced award to the mother. First, the mother has custody of the parties' other child. More importantly, the identity of the custodian is a relevant factor in determining who should be awarded the marital home, which, depending on the parties' financial circumstances, might affect *when* the noncustodial parent will receive a fair share of the marital assets, but should not preclude the noncustodial party from receiving a fair share of those assets. As for the mother's alleged cruel treatment of the father, the court found that the father was "quite upset" that the mother's boyfriend visited her after the parties' separation at the marital home within plain view of the paternal grandmother's house, where the father was living at the time. While father's reaction is understandable, we fail to see how the mother's behavior constituted fault. See 15 V.S.A. § 751(b)(12) (court may consider respective merits of parties).

Finally, the court's refusal to award maintenance made the property award even more inequitable. See *id.* § 751(b)(7) (court may consider "whether the property settlement is in lieu of or in addition to maintenance"). In declining to award maintenance, the court noted that the mother presented no evidence regarding her reasonable needs or her standard of living since the parties' separation. The mother challenges this decision on appeal. We need not reach the issue because we strike the court's maintenance ruling in light of our reversal of the property division. See *Dreves*, 160 Vt. at 335, 628 A.2d at 561 (where property division is reversed, maintenance ruling should also be reexamined because of interrelationship between property and maintenance awards).

*The provisions of the divorce order dividing the marital assets and denying plaintiff maintenance are reversed, and the case is remanded for further consideration of those matters; the order is affirmed in all other respects.*