NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 54

No. 2017-348

| | |
|---|---|
| Andrew Alex Bratton | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Family Division |
| | |
| Laura Holland (Bratton) | March Term, 2018 |

Michael R. Kainen, J.

John C. Mabie of Corum Mabie Cook Prodan Angell & Secrest, PLC, Brattleboro, for
  Plaintiff-Appellant.

Thomas W. Costello and Adam W. Waite of Costello, Valente & Gentry, P.C., Brattleboro,
  for Defendant-Appellee.


PRESENT: Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Morris, Supr. J. (Ret.),
          Specially Assigned


¶ 1. **REIBER, C.J.** Father appeals from the denial of his motion to modify legal and physical parental rights and responsibilities in the parties' son D.B. Father argues that the court improperly treated the child's maternal grandfather as a "fictive parent" and gave him too much weight in evaluating the statutory best-interests factors. We affirm the court's finding that changed circumstances exist, but reverse and remand its best-interests analysis for additional proceedings.

I. Procedural History

¶ 2. We recount the procedural history in detail as it bears on the ruling at issue here. D.B. was born in January 2007. When parents divorced in November 2011, they agreed that

mother would have physical rights and responsibilities in D.B. and the parties would share legal rights and responsibilities. The parenting plan contemplated that mother and D.B. would live in North Carolina. Father would have twice-weekly Skype contact with D.B., five weeks of visitation during the summer, and the parties would split other school vacations.

¶ 3. Mother did not abide by the parent-child contact order and by June 2012, father filed his first motion to enforce parent-child contact. Mother did not respond or appear at the hearing on the motion. In a February 2013 order, the court awarded father an additional week of summer contact to make up for a week of spring vacation that mother had withheld.

¶ 4. In December 2015, father filed a second motion to enforce. Again, mother did not appear at a hearing on the motion. In June 2016, the court found that mother had withheld four weeks of visitation from father, including D.B.'s 2015 spring vacation, his two-week 2015 Christmas vacation, and his 2016 spring vacation. Mother consistently withheld father's twice-weekly Skype contact as well. The court expanded father's 2016 and 2017 summer visits to seven weeks and ordered mother to abide by the Skype contact. The court directed mother to turn D.B. over to father on July 9, 2016 for his summer visit and ordered her to facilitate Skype contact. Mother was advised that her failure to comply could lead to contempt proceedings. A sheriff served mother a copy of the court's order. Nonetheless, when father went to retrieve D.B. on the arranged date, mother and D.B. were nowhere to be found. Father was forced to return to Vermont without the child.

¶ 5. In July 2016, father filed a third motion to enforce and a motion for contempt; he also moved to modify parental rights and responsibilities. Mother did not appear at the hearing on father's motions. In a September 2016 order, the court found mother in contempt. It found that mother willfully violated court-ordered visitation in April 2015, December 2015, April 2016, and July 2016. It made more extensive findings on the record. Based on the evidence presented at the hearing, the court found that it was no longer in D.B.'s best interests to remain in mother's custody.

2

Effective September 24, 2016, it transferred legal and physical custody of D.B. to father and it ordered mother to turn D.B. over to father. The court scheduled a hearing on October 3, 2016, to discuss mother's visitation.

¶ 6. Notwithstanding the court's order, mother did not turn D.B. over to father. Mother initially told father's attorney that D.B. was away for the weekend. Mother did not appear for the October 3 hearing and made an excuse for her absence that the court did not find credible. In an October 2016 ruling, the court found that mother failed to abide by its orders or purge herself of prior contempts. It issued a separate arrest warrant requiring that mother be brought before the court as soon as she was found. The court asked North Carolina authorities to give its order full faith and credit and to turn D.B. over to his legal custodian. A North Carolina court subsequently issued an order for expedited enforcement of a foreign child custody order,[1] and mother finally

---

[1] The North Carolina court found that Vermont, as the issuing court, had, and continued to have, jurisdiction over this matter. Although mother has raised no jurisdictional challenge, we agree with the North Carolina court that Vermont continues to have jurisdiction over this case. Vermont issued the initial child custody determination in this case at a time when all parties were living in Vermont. See 15 V.S.A. § 1071. Because Vermont made the initial child custody determination, Vermont "has exclusive, continuing jurisdiction over the determination" until "a Vermont court determines that neither the child nor the child and one parent . . . have a significant connection with Vermont, and that substantial evidence is no longer available in Vermont concerning the child's care, protection, training, and personal relationships," or a court determines that the child and both parents, or any person acting as a parent, "do not currently reside in Vermont." Id. § 1072(a)(1), (2). "The law is clear that only a court of the issuing state can decide that it has lost jurisdiction due to erosion of a 'significant connection' between the child and the state." Ward v. LaRue, 2016 VT 81, ¶ 18, 202 Vt. 499, 150 A.3d 631 (quotation omitted). Vermont has never relinquished jurisdiction over this matter, and father continues to reside in Vermont. D.B. also resided in Vermont with father between October 2016 and September 2017. There is no question that Vermont retains jurisdiction. See id. ¶ 20 (recognizing that Vermont, as issuing court, retained jurisdiction over child-custody dispute and substantial evidence continued to be available in Vermont where father remained in Vermont and key issues were father's access to information about child and enforcement of his right to parent-child contact).

Under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), "[a] Vermont court which has jurisdiction under this chapter to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances, and that a court of another state is a more appropriate forum." 15 V.S.A. § 1077(a). Again, mother did not argue that Vermont was an inconvenient forum, and the court thus made no ruling on this question. It is apparent, however, that at the time the court rendered

turned D.B. over to father on October 18, 2016. At that point, father had not seen D.B. for fourteen months.

¶ 7. Counsel for mother entered a notice of appearance on October 31, 2016, and in November 2016, mother requested parent-child contact. The court later clarified that its transfer of custody to father in September 2016 had been on a temporary interim basis based on mother's failure to facilitate visitation with father and her willingness to ignore court orders to thwart father's visitation. While the court had heard limited testimony to ensure that father could safely and adequately provide for D.B., it did not at that time have any basis for comparison to the environment that mother provided. The court thus scheduled an evidentiary hearing on what custody arrangement was in D.B.'s best interests.

## II. Ruling on Motion to Modify

¶ 8. Following a hearing, the court issued a September 2017 order concluding that it was in D.B.'s best interests that mother have primary physical custody. It made the following findings. Father works as a software engineer. He shares a house with two roommates. D.B. has friends in the neighborhood and at school. He sees his paternal grandparents at least once a week. D.B. was doing well in school and he easily managed the transition back to Vermont. Father does

---

its decision, significant evidence concerning D.B.'s best interests was available in Vermont, D.B. himself was living in Vermont, the Vermont court was poised to decide the issues before it expeditiously, and the Vermont court was intimately familiar with the facts and issues in the pending litigation given its many orders in this case prompted by mother's ongoing refusal to allow father to have contact with D.B. See id. § 1077(b)(6)-(8) (identifying factors, including those cited, as relevant to "inconvenient forum" analysis). We relied on similar factors in Ward, 2016 VT 81, ¶ 23. There, we upheld the trial court's conclusion that Vermont remained a convenient forum to resolve a child custody dispute where the father remained in Vermont, "Vermont ha[d] issued numerous orders since mother relocated, all of which stemmed from mother's failure to comply with existing orders," there were "no disputes about mother's ability to exercise her parental rights," evidence was "easily accessible in Vermont," "Vermont courts ha[d] decided the issues expeditiously," and "Vermont courts [were] also familiar with the facts and issues in [the] proceedings." Id. Indeed, not unlike the present case, we emphasized the importance of this final factor "given mother's ongoing behavior and the fact that mother was previously warned that her continued interference with father's rights [might] trigger a change in custody." Id. As in Ward, Vermont continues to be a convenient forum under the UCCJEA.

not have not a driver's license and his activities with D.B. were more restricted than D.B.'s activities in North Carolina.

¶ 9.    While D.B. was living with mother, mother did not communicate information about him to father.  She has never abided by the Skype time ordered.  She ignored father's texts and calls and threw away a birthday card that father had sent to D.B., causing D.B. to believe that father was ignoring him.  The court recited detailed evidence showing that father repeatedly asked for contact, visitation, and information about D.B. and mother ignored him, made excuses why D.B. was not available, and tried to alter contact dates.  Mother treated father's contact with D.B. as a nuisance, which she would occasionally grant if father begged enough and if it was convenient.  Mother also interfered with father's ability to obtain medical information about D.B. and refused to provide father with D.B.'s health insurance information.

¶ 10.    When D.B. returned to Vermont, mother ignored father's attempts to set up regular communication with D.B.  Despite mother's behavior, father was very good at ensuring that mother and D.B. communicated.  During this time, mother sent messages to D.B. intimating that his home was with her and suggesting that she was trying to "rescue him" from Vermont.  Mother also told D.B. that she was going to put surveillance tracking on his iPad so that she would know that it was really him talking.  While mother denied doing these things at the hearing, the court did not find her credible.  The court found that mother clearly had boundary issues.

¶ 11.    D.B.'s maternal grandfather is an opthamologist and surgeon, and the court found that "he frankly tip[ped] the balance" in this case.  The court found little positive to say about mother's parenting other than that she loved D.B.  Grandfather, however, provided mother with a job and a nice house in a nice neighborhood.  The court found that grandfather was "really D.B.'s fictive parent in North Carolina."  Grandfather took D.B. to most of his activities and often participated in these activities with D.B.  D.B. often spent the night at grandparents' house or their summer house.  D.B. enjoyed a higher standard of living, better housing, and was engaged in more

5

activities in North Carolina than in Vermont. The court noted that all of this would evaporate if something happened to grandfather or if mother became estranged from him. Mother had apparently hidden father's attempts to contact D.B. from grandfather. She did not tell grandfather about the court's orders. Grandfather thought father was ignoring D.B. Grandfather first learned otherwise when a warrant issued for mother's arrest.

¶ 12.     Mother is engaged to a new partner with whom she had been living for two years at the time of the hearing. Mother and her partner have two young children. D.B. benefited from the partner's presence. Like grandfather, the partner did not know that mother was denying visits to father and avoiding contact with father.

¶ 13.     The court found that mother had an indescribable flat affect during the hearing, and her testimony was monotone and not credible. The court questioned whether mother had been diagnosed with any mental health issues. The testimony indicated that mother had seen the same therapist for thirteen years and that she had been diagnosed with ADD/ADHD and suffered panic attacks, and that she experienced some post-partum depression. The court stated its belief that there was more going on than what it had been told.

¶ 14.     The court determined that mother engaged in a calculating and knowing attempt to thwart visitation and that D.B. was harmed by her actions. Nonetheless, it concluded that the statutory best-interests factors narrowly favored mother having physical custody of D.B. and "only due to [grandfather]'s presence in D.B.'s life." Turning to the specific best-interests factors, the court found that both parents could provide D.B. with love and affection and guidance and each adequately provided him food, clothing, medical care, a safe environment, and other material needs. Mother alone would not do as well as father in providing for D.B.'s developmental needs. When in North Carolina, however, mother "delegate[d] this to her father . . . who does an outstanding job." D.B. did well in school and in his community in both North Carolina and Vermont. Mother had demonstrated her inability to support contact with father. Father, on the

6

other hand, encouraged mother to be in contact with D.B.'s school and therapists in Vermont. He was diligent in ensuring that mother communicated with D.B. Mother had been D.B.'s primary parent for most of his life; father had done a good job since D.B. arrived in Vermont. D.B. has a good relationship with father's parents in Vermont. The court's decision, however, "turn[ed] on [D.B.'s] relationship with . . . his maternal grandfather." Grandfather appeared to occupy most of D.B.'s nonschool time with enriching activities.

¶ 15. The court acknowledged that its decision had been "an extremely close call." It reiterated that its conclusion was based on grandfather's involvement with D.B. as well as its belief that going forward, mother would support father's contact with D.B. The court stated that it would "not touch" the joint legal rights and responsibilities that the parties had originally agreed to, observing that it would be difficult for the parties to share custody even if they were not 1000 miles apart. Father appealed from this order.

III. Analysis

¶ 16. At the outset, we note that no party challenges the court's finding that there had been a real, substantial change in circumstances, and we affirm this portion of the court's ruling. Father focuses on the court's best-interests analysis. He argues that mother should not have been awarded physical custody given her alienating and contemptuous behavior and her delegation of parenting responsibilities to grandfather. He contends that the court placed too much weight on grandfather in evaluating the statutory best-interests factors, and its order improperly elevated grandfather over him, thereby interfering with his constitutional right to parent D.B. Father also asserts that the court erred by failing to address his request for primary legal parental rights and responsibilities given the breakdown of communication between the parties.

¶ 17. We agree that the court erred. While the court has broad discretion in evaluating the statutory best-interests factors, Maurer v. Maurer, 2005 VT 26, ¶ 10, 178 Vt. 489, 872 A.2d 326 (mem.), its approach here was unfair and inconsistent with the plain language of 15 V.S.A.

7

§ 665(b). The court also failed to fairly account for mother's egregious behavior toward father and explain the basis for its belief that mother's behavior would change going forward. We conclude that the court abused its discretion, and we therefore reverse and remand for additional proceedings. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) (stating that abuse of discretion exists where a ruling based "on an erroneous view of the law or on a clearly erroneous assessment of the evidence").

¶ 18.    In a contested custody case such as this one, the court must compare parent to parent.[2]  We recognized this in Miles v. Farnsworth, 121 Vt. 491, 495, 160 A.2d 759, 761-62 (1960). In that case, pursuant to the parties' agreement, a grandmother was providing the actual care for a child, although the father had nominal custody. At the mother's request, the court modified its order to award custody to mother. We affirmed its decision on appeal. We found it "apparent that the real issue determined by the court below was whether the mother or the grandmother should have the actual and active custody of the boy," but we emphasized that "the grandmother is actually a third person to this marriage relationship." Id. at 495, 160 A.2d at 761. "As between a mother and a third party," we explained, "the mother must prevail in a custody case, in the absence of compelling reasons to the contrary which are not present here." Id. When the attributes of the father and mother were compared, the court's findings supported the award of custody to the mother.

¶ 19.    While this case predated the enactment of 15 V.S.A. § 665, the controlling standard in Miles, and subsequently, has always been the best interests of the child. See Paquette v. Paquette, 146 Vt. 83, 90, 499 A.2d 23, 28 (1985) (recognizing, as of 1985, that best-interests-of-

---

[2] Despite the court's references to grandfather as D.B.'s "fictive parent" in North Carolina, the court did not consider or find that grandfather was entitled to status as a "parent" under Vermont law. Cf. Sinnott v. Peck, 2017 VT 115, ¶ 1, __ Vt. __, 180 A.3d 560 (considering "whether an individual who is not biologically related to a child, has not legally adopted the child, and is not married to the child's legal parent may be the child's legal parent").

the-child standard "has been the primary consideration in determining issues of custody for over sixty years"); see also Miles, 121 Vt. at 493, 160 A.2d at 760 (finding it "well settled that it is the welfare of the child which in the last analysis is determinative in a custody matter" and equally well settled that there must be change in circumstances to modify existing custody order (quotation omitted)); Raymond v. Raymond, 120 Vt. 87, 95, 132 A.2d 427, 431-32 (1957) ("The matter of custody is not an easy one for the court to determine, and it often involves a balancing of the advantages and disadvantages incurred by granting custody to one spouse or the other. The good of the child is the paramount consideration and it is for the court to weigh every circumstance bearing on the child's future welfare in passing on this question."). Certainly, the Miles Court recognized that the grandmother played an important role in the child's life; indeed, she had been the child's primary caregiver for seven years, beginning when the child was eighteen months old. It made clear, however, that the grandmother was not a parent, and thus the Court was required to compare the mother to the father. See Miles, 121 Vt. at 495, 160 A.2d at 761-62; see also Moreau v. Sylvester, 2014 VT 31, ¶ 30, 196 Vt. 183, 95 A.3d 416 (stating that "crux" of Miles was whether mother established change of circumstances, but "[t]o the extent that Miles considered third-party rights, it concluded that short of extraordinary circumstances, a mother's rights as a natural parent trumped third-party, and even grandmotherly, interests in the custody of the child").

¶ 20. The statutory best-interests factors echo this holding, and most of the factors expressly require a parent-to-parent comparison. See Harris v. Harris, 149 Vt. 410, 417-18, 546 A.2d 208, 213-14 (1988) (noting that "[a]lmost all the [statutory] factors begin with some variation of the words 'the ability and disposition of each parent to,' " and concluding that 15 V.S.A. § 665 "requires each parent to show his or her relationship with the child in light of the statutory factors," rather than simply showing that other parent is inadequate, thereby ensuring "more balanced and complete analysis" required by statute). Most factors focus on each parent's ability to accomplish certain things on behalf of their child. Thus, the court must consider "the ability and disposition

9

of each <u>parent</u> to meet the child's present and future developmental needs," and "the relationship of the child with each <u>parent</u> and the ability and disposition of each <u>parent</u> to provide the child with love, affection, and guidance." 15 V.S.A. § 665(b)(1), (3) (emphases added).

¶ 21. Certainly, grandfather's relationship with D.B. is important and worthy of consideration. There is a separate statutory best-interests factor that specifically addresses "the relationship of the child with any other person who may significantly affect the child." <u>Id</u>. § 665(b)(7). We agree that this can be a critical factor in assessing a child's best interests and it may tip the scales in the best-interests analysis. The court here, however, improperly allowed grandfather's relationship with D.B. to permeate other best-interests factors that are limited by their plain terms to an evaluation of <u>parents'</u> capacities. In considering § 665(b)(3), the court erred in concluding that although mother "alone" would not do as well as father in providing for D.B.'s developmental needs, she "delegate[d]" this parental responsibility to her father "who does an outstanding job." The court was required to compare father to mother "alone," not father to a third party. Grandfather was not being awarded custody, and as the trial court acknowledged, if anything happened to grandfather, the factors that favored <u>mother</u> "would quickly evaporate."

¶ 22. As pertains to the court's reliance upon grandfather's key role in the best-interests calculus and mother's parental responsibilities, § 665(b)(5), there was no evidence or finding as to grandfather's orientation to supporting and facilitating a positive relationship and frequent and continuing contact between D.B. and his father in the face of mother's alienating behavior, other than grandfather's apparent belief, prior to the revelation of mother's conduct, that father was a "cold person who never sent his son a birthday or Christmas card," and to his knowledge "had not tried to contact his son in a year." The court similarly failed to square its findings about mother's alienating behavior with its conclusion that mother and father could equally provide D.B. with "love, affection, and <u>guidance</u>." <u>Id</u>. § 665(b)(1) (emphasis added); see <u>Spaulding v. Butler</u>, 172 Vt. 467, 477, 782 A.2d 1167, 1175 (2001) (concluding that trial court's finding that this factor

10

favored father was undermined by its findings that father "was engaged in a long-term, persistent campaign to cut off any relationship" between child and mother).

¶ 23.    As set forth above, the court found little positive to say about mother's parenting other than that she loved D.B.  Mother engaged in egregious behavior designed to thwart father's relationship with the child.  She repeatedly denied father visitation with D.B. over the course of many years.  She failed to attend court hearings.  She defied numerous court orders designed to ensure that father had parent-child contact.  Her behavior was detrimental to D.B.  It took an arrest warrant and court action in North Carolina for mother finally to abide by the court's order and allow father to have contact with D.B.  Mother deprived father of parent-child contact for fourteen months.[3]

---

[3]    The dearth of any positive findings concerning mother (to say nothing of the many negative findings about her) distinguishes this case from the cases cited by the dissent, post ¶¶ 32-33.  In Harris v. Harris, for example, the trial court found that a child's grandmother "played a significant role in his life and development," but it also found that the father "spent a significant amount of time with [the child]" and "the two engaged in a variety of activities constructive to [the child's] emotional development."  162 Vt. 174, 179, 647 A.2d 309, 313 (1994).  The remaining cases cited by the dissent similarly show some positive attributes of the parent being awarded custody and they do not rely solely on the child's relationship with a third party.  See Habecker v. Giard, 2003 VT 18, ¶¶ 10-14, 175 Vt. 489, 820 A.2d 215 (mem.) (recognizing in proposed relocation case that children's relationships with maternal and paternal grandparents and aunts who lived in Vermont was "critical component" of court's decision to transfer custody to father, but decision also relied on findings that father was better suited to provide safe environment for children, father was " 'much more likely to assure a positive relationship and ongoing contact with mother than the reverse,' " father offered children more stability than mother, and father was better able to place children's needs ahead of his own); deBeaumont v. Goodrich, 162 Vt. 91, 99-100, 644 A.2d 843, 848 (1994) (upholding transfer of custody to father in proposed relocation case, and explaining that trial court found both parents "dedicated, caring, sensitive, conscientious, moral and effective" and both were strongly bonded to children, but father had steady disposition, good job, children could remain in community and school where they had done well, children would have continuing contact with paternal grandparents who had become very important in their lives, and father was more likely to foster good relationship with other parent).

As these cases and the statute reflect, the significance of a third party's relationship with a child is one factor among many.  It is possible that this factor could provide the "tipping point" in a custody award, and we do not suggest otherwise.  The bulk of the best-interests factors, however, require the court to consider each parent's ability to satisfy the relevant best-interests criteria and they do not allow the court to compare a parent to a third party.  The error here was the court's comparison of father to grandfather where the statute clearly required it to consider "each parent's

¶ 24. Certainly, mother's "sustained course of conduct . . . designed to interfere in the child's relationship" with father "casts serious doubt" upon mother's fitness "to be the custodial parent." Miller-Jenkins v. Miller-Jenkins, 2010 VT 98, ¶ 15, 189 Vt. 518, 12 A.3d 768 (mem.) (quotation omitted); see also 15 V.S.A. § 650 (finding and declaring as public policy that it is in best interests of child to have "opportunity for maximum continuing physical and emotional contact with both parents, unless direct physical harm or significant emotional harm to the child or a parent is likely to result from such contact"). We have recognized that because children thrive with love and support of both parents, "[o]ne parent's attempts to hamper the other's parent-child relationship therefore typically demonstrates a lack of regard for the child's best interests and suggests that a transfer of custody may well be in the child's best interests." Miller–Jenkins, 2010 VT 98, ¶ 25; see also Sundstrom v. Sundstrom, 2004 VT 106, ¶ 38, 177 Vt. 577, 865 A.2d 358 (mem.) (recognizing that "obstruction of visitation and attempts at parental alienation are not in a child's best interests, and they may form the basis for a change in custody," and citing cases so holding).

¶ 25. Although the trial court acknowledged that mother's refusal to allow visitation was detrimental to D.B., it believed that going forward, mother would support father's contact with the child. The court's findings do not support such a belief, however, and there is nothing in the record to show that mother regrets her behavior, has any self-awareness about her conduct, or that she is committed to ensuring parent-child contact in the future. To the contrary, while D.B. was in Vermont with father, mother continued to engage in alienating and obstructive behavior. She also repeatedly lied about her behavior during the hearing in this case and took no responsibility for her actions or the consequences of her behavior on D.B. or father. She professed not to have read a court order served on her by a sheriff or know that father was arriving in July 2016 to pick up

___

ability and disposition" to accomplish certain things. The court considered grandfather in evaluating statutory best-interests factors that, by their terms, did not involve him.

D.B.; she denied depriving father of parent-child contact, asserting that she had to block father's calls because he was "harassing" her and that he should have come up with other ways to contact her; she testified that she did not feel that she had denied father parent-child contact; she led other people, including D.B., to believe that father did not want any contact; and she also believed that her communications with D.B. while he was at his father's home were appropriate.[4]

¶ 26.    The court's belief that mother's behavior would change was a linchpin of its decision.  Because this belief is unsupported by any findings or evidence, and because the court erred in its evaluation of the statutory best-interests factors, we reverse and remand for additional proceedings consistent with this opinion.  Given the significant passage of time, the court should take new evidence on what course of action is in D.B.'s best interests.  See Engel v. Engel, 2012 VT 101, ¶ 19, 193 Vt. 19, 71 A.3d 1124 (similarly concluding that "[g]iven the significant passage of time" since prior hearing, trial court on remand "should conduct an additional evidentiary hearing to assess the current best interests of the children").  Given our conclusion, we do not reach father's argument that the court erred by ignoring his request for sole legal rights and

---

[4] This case is significantly different from Knutsen v. Cegalis, 2016 VT 2, 201 Vt. 138, 137 A.3d 734 (Knutsen I), cited by the dissent, post ¶ 41, and Knutsen v. Cegalis, 2017 VT 62, __ Vt. __, 172 A.3d 180 (Knutsen II).  In Knutsen I, we concluded that the trial court had properly focused its analysis on the child's best interests, and upheld its decision that, despite the father and stepmother's egregious alienating acts, the child's best interests required that he remain in the father's custody.  The trial court there found by clear and convincing evidence that "the child would be at significant risk of mental health problems" if reunification efforts with mother continued, and "it did not matter why the child was at risk; what mattered was that the risk existed." 2016 VT 2, ¶ 31.  In Knutsen II, we recognized that father and stepmother continued to act egregiously, yet they had also testified "to a change-of-heart as to reunifying [the child] with mother." 2017 VT 62, ¶ 11.  While the trial court "viewed the stated change-of-heart very skeptically," id. ¶ 13, it cited this testimony in its decision and "relied a great deal on father's and stepmother's stated positions as a basis for its ruling." Id. ¶ 15.  We deferred to the trial court's credibility assessment and the court's assessment of the evidence that it "had before it at the time." Id. ¶ 22.  Unlike Knutsen II, mother here has not disavowed her conduct or promised to change her behavior going forward.  To the contrary, as recounted above, mother does not appear to believe that she has done anything wrong.  The trial court's "hope" that grandfather would "encourage" mother to abide by parent-child contact orders is not grounded in any evidence and it does not suffice to support the court's key finding here.  Cf. post ¶ 42.

responsibilities. We emphasize, however, that on remand, the court must consider the appropriate award of both physical and legal custody.

The court's finding of changed circumstances is affirmed; its best-interests analysis is reversed and remanded for additional proceedings consistent with this opinion.

FOR THE COURT:

_____

Chief Justice

¶ 27. **ROBINSON, J., dissenting.** I believe the majority has strayed from the applicable standard of review as well as the Legislature's directions concerning the "best-interests" analysis. In particular, the majority fails to give due deference to the weight the trial court assigns to the child's relationship with another person who may significantly affect the child, redefining the statutory best interests standard in the process. In addition, the majority substitutes its own assessment of mother's likely future efforts to foster a positive relationship between D.B. and father for the trial court's. For these reasons, I respectfully dissent.

¶ 28. Our standard of review in these cases is well established, both as to the trial court's findings of fact, and its exercise of discretion in awarding parental rights and responsibilities and parent-child contact on the basis of its findings. With respect to factual findings, we will uphold the trial court's findings "if they are supported by credible evidence." Maurer v. Maurer, 2005 VT 26, ¶ 10, 178 Vt. 489, 872 A.2d 326 (mem.). In evaluating the evidence, we must "make all reasonable inferences in support of the court's judgment." Bevins v. King, 147 Vt. 203, 206, 514 A.2d 1044, 1046 (1986). We have emphasized that it is the exclusive role of the trial court—not this Court—to assess the credibility of witnesses and to weigh the evidence. See Kanaan v. Kanaan, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995) (explaining that trial court's findings are entitled to substantial deference due to its unique position to assess credibility of witnesses and

14

weigh evidence); Payrits v. Payrits, 171 Vt. 50, 54, 757 A.2d 469, 472-72 (2000) ("[T]he credibility of the witnesses, the weight of the evidence, and its persuasive effect are questions for the trier of fact . . . . ").

¶ 29.    Under this framework, a trial court has broad discretion in determining a child's best interests.  See Myott v. Myott, 149 Vt. 573, 578, 547 A.2d 1336, 1339-40 (1988).  This court cannot set aside the trial court's decision "because we would have reached a different conclusion from the facts."  Id. at 579, 547 A.2d at 1339.  We have held that the trial court should consider all the statutory factors in 15 V.S.A. § 665(b) in evaluating parental rights and responsibilities and parent-child contact.  Bissonette v. Gambrel, 152 Vt. 67, 69, 564 A.2d 600, 601 (1989).  But we generally defer to the trial court as to the particular weight each factor warrants in the context of a particular case.[5]  See Myott, 149 Vt. at 578, 547 A.2d at 1339 ("The trial court has broad discretion in a custody matter, and we must affirm unless the discretion is erroneously exercised, or was exercised upon unfounded considerations or to an extent clearly unreasonable in light of the evidence." (quotation omitted)).

¶ 30.    Finally, "the focus of the [inquiry] must be the best interest of the child, not equity between the parties."  Bissonette, 152 Vt. at 70, 564 A.2d at 602; see also Knutsen v. Cegalis, 2016 VT 2, ¶ 30, 201 Vt. 138, 137 A.3d 734 ("The best interests of the child remain paramount in all custody decisions, and a decision to transfer custody cannot be based on a desire to punish the alienating parent." (quoting Miller-Jenkins v. Miller-Jenkins, 2010 VT 98, ¶ 25, 189 Vt. 518, 12 A.3d 768 (mem.))).

---

[5]    Even the weight to be afforded the "primary care provider" factor, which we have frequently identified as the most important, is largely within the discretion of the trial court.  See, e.g., Habecker v. Giard, 2003 VT 18, ¶ 14, 175 Vt. 489, 820 A.2d 215 (mem.) (recognizing that "a primary care provider finding is entitled to great weight," but noting that "the weight accorded to [this] factor depends upon the quality of the relationship between the child and custodian, as well as the likely effect that a change of custodian will have on the child").

¶ 31. With these standards in mind, I believe the majority's analysis falls short in addressing the two factors most in play in this case. First, the majority improperly faults the trial court for giving too much weight to the relationship between a child and any other person who may significantly affect the child, even though the trial court clearly concluded that in the circumstances of this family—with an eye on this child's best interests—this factor was dispositive. In doing so, the majority reads out the Legislature's express instruction that the court must consider the relationship between the child and other people who may significantly affect the child. 15 V.S.A. § 665(b)(7). Second, the majority concludes from its independent review of the evidence that the trial court did not give enough weight to mother's inability to foster a positive relationship between D.B. and father. In short, the majority would strike a different balance in this case rather than deferring to the judgment of the factfinder who had the opportunity to observe the witnesses and assess the situation.

I. The Child's Relationship with Maternal Grandfather and § 665(b)(7)

¶ 32. The Legislature has included among the factors courts must consider in the best-interests analysis "the relationship of the child with any other person who may significantly affect the child," 15 V.S.A. § 665(b)(7), and this Court has frequently recognized that a child's relationship with another adult associated with one of the parents—typically a partner or family member—can be a critical factor in assessing the child's best interests. In the case of Harris v. Harris, 162 Vt. 174, 647 A.2d 309 (1994), for instance, the mother argued that the trial court had erroneously awarded the father custody based on the paternal grandmother's role caring for the child, and that the court had essentially chosen the paternal grandmother over the mother as the custodial parent. The paternal grandmother dressed the child, fed him breakfast after the father went to work, cared for him during the day until the father got home, and more often than not served the father and the child dinner. Frequently, the child slept at her house. This Court affirmed the trial court's award of custody to the father even though it concluded that the mother had

previously been the child's primary caregiver. Id. at 177-79, 647 A.2d at 312. The Court noted the trial court's findings that the paternal grandmother played a significant role in the child's life and development and concluded that "[t]he father should not be disadvantaged for his fortune in having a mother who operates a day care facility nearby and who is willing and eager to care for his son while he is at work." Id. at 179, 647 A.2d at 313.

¶ 33. In Habecker v. Giard, this Court likewise affirmed an order transferring custody from the mother to the father upon the mother's relocation based in large part on the child's relationships with aunts and grandparents who remained in Vermont. 2003 VT 18, ¶¶ 13-14, 175 Vt. 489, 820 A.2d 215 (mem.). Describing the trial court's analysis, which this Court affirmed, we wrote:

> The seventh factor, "the relationship of the child with any other person who may significantly affect the child," was a critical component of the court's decision. The court noted that the children's relationships with their maternal and paternal grandparents and aunts were a source of stability for the children despite the discord between their parents. The court concluded that to deprive the children of these longstanding family ties and frequent contacts would be a great loss to the children.

Id. ¶ 13 (quotation and citation omitted); see also deBeaumont v. Goodrich, 162 Vt. 91, 99, 644 A.2d 843, 848 (1994) (relying in part on fact that award of custody to father "allowed continuing contact with the parental grandparents, who had become very important in the lives of the children").

¶ 34. The majority doesn't deny that this factor may be significant, but seems to suggest that it shouldn't be too significant. It's hard to understand why not. The majority does not take issue with the trial court's finding that D.B. has greater opportunity for enriching activity in North Carolina, due largely to the efforts of D.B.'s maternal grandfather who spends a tremendous amount of time with D.B. In describing maternal grandfather as D.B.'s "fictive" parent, the trial court emphasizes the critical role grandfather plays in D.B.'s life. This is precisely the kind of

17

relationship courts are supposed to consider and value pursuant to § 665(b)(7). In a truly child-centered best-interests analysis, the fact that D.B.'s relationship with grandfather is so central to his life would be a reason to assign more, not less, weight to this factor. I may not have assigned this factor the same weight as the trial court, but it was clearly well within its discretion in concluding that this factor weighed heavily enough to tip the balance.

¶ 35.    The majority's reliance on a decision from 1960 addressing a very different issue, at a time before the Legislature even adopted the § 665(b) factors, is misplaced. In Miles v. Farnsworth, 121 Vt. 491, 160 A.2d 759 (1960), a court had originally awarded custody of a minor child to his father, subject to the condition that the child live with his paternal grandparents. When the child was ten, the mother sought modification of custody. In affirming the trial court's change of custody to the mother, this Court considered the mother's remarriage, her new home, and her changed life circumstances, as well as the paternal grandmother's advancing age and likely inability to keep up with the needs of an active ten-year-old. Id. at 494-95, 160 A.2d at 761. The Court noted that the evidence and findings disclosed that the child had been in the actual care of his paternal grandmother since the time of the divorce; although the father had nominal custody and loved the child, he did little to supervise and train him. Id. at 493, 160 A.2d at 760. After discussing the grandmother's aging, and its effect on her ability to continue to parent the child, the Court said that while "the real issue determined by the Court below was whether the mother or the grandmother should have the actual and active custody of the boy," the grandmother was actually "a third person to this marriage relationship." Id. at 495, 160 A.2d at 761. Comparing the mother to the father, the court awarded custody to the mother.

¶ 36.    This case is inapplicable here for three reasons. First and foremost, in Miles the grandmother had been acting as the child's primary care provider for years with only nominal participation by the father, and pursuant to a court order designed to ensure that the child lived with her, despite the nominal award of custody to father (grandmother's son). In that context, the

18

Court's statement that the relevant comparison should be between mother and father, and that as between mother and paternal grandmother mother must prevail, made sense. The Court was <u>not</u> suggesting that the grandmother's significant role in the child's life should not be considered in that balance, but was recognizing that in that case, the father really had no significant parental role. In this case, by contrast, grandfather is clearly a central—perhaps the most important—adult figure in D.B's life, but mother has her own home and, as the trial court expressly found, has been D.B.'s primary parent for most of his life. There is no basis in this case to conclude that mother is only "nominally" seeking parental rights and responsibilities while grandfather is the actual primary parent. Mother may rely heavily on grandfather to provide significant parenting support—just like the father in <u>Harris</u>, above—but, as the trial court found, she has acted and continues to act in a parental capacity. By invoking <u>Miles</u> in this context, the majority seems to hold that the very significant role of another adult in D.B.'s life cannot be a scale-tipping factor in the best-interests analysis; <u>Miles</u> does not support that assertion.

¶ 37. Second, and significantly, this case from 1960 long preceded the statute enumerating the best-interests factors—including § 665(b)(7)—that the trial court must consider in assigning parental rights and responsibilities. The <u>Miles</u> decision makes no reference to any statute; it was decided under a different framework. By using <u>Miles</u> in this way, and by suggesting that D.B.'s relationship with another adult can never tip the balance, the majority essentially eliminates § 665(b)(7) as a true factor in the best-interests analysis.

¶ 38. Third, the <u>Miles</u> Court's assessment of the weight to be afforded to the child's relationship with the grandmother was driven to a large extent by the Court's recognition that due to her age, the grandmother was not in a position to continue in the role of primary caregiver. The Court did not expressly discuss the weight to be given to the child's relationship with the grandmother, as the statute did not at the time require consideration of this factor, but its discussion

makes clear that because of the grandmother's age and presumed inability to keep up with the child, his relationship with her was not due much weight.

¶ 39.     Nor here is the trial court's analysis undermined by its recognition that if something happens to grandfather, the balance would be different.  The court was clear in its decision that the baseline expectations against which a future motion to modify parental rights and responsibilities should be assessed include grandfather's continued participation in D.B.'s life.  If grandfather moves or stops engaging with D.B., that would be a changed circumstance, potentially triggering a modification of the custody arrangement under 15 V.S.A. § 668.  This doesn't undermine the court's decision; it reinforces that the court thoughtfully weighed the relevant factors and concluded that, given the current state of affairs, keeping D.B. with mother, in large part so that D.B. would have the continued benefit of his relationship with grandfather, was in the child's best interests.  Any time § 665(b)(7) is a factor in the best-interests analysis, the child's best interests are subject to change based on the presence of a third party.  That's inherent in the factor itself.

II.  § 665(b)(5) and Mother's Failure to Foster a Positive Relationship

¶ 40.     The majority's scrutiny of the trial court's assessment of mother's failure to foster a positive relationship with father likewise departs from the standard of review and our own recent precedent.  In particular, the majority faults the trial court for its expressed hope and belief that mother's behavior in undermining D.B.'s relationship with father will change, and it asserts that the trial court's conclusion on this point is unsupported by the evidence.

¶ 41.     The majority's approach in this case stands in stark contrast to the Court's recent opinion in Knutsen, 2016 VT 2.  In that case, the trial court found that by promoting the false belief that the mother had abused the child, the child's father and stepmother had effectively destroyed the child's formerly good relationship with his mother.  Id. ¶¶13-14.  After recounting a long history of intransigence by the father and stepmother, including their continued refusal even during the appeal before the Court to back away from their claims of abuse by the mother, the Court

affirmed the trial court's continued award of parental rights and responsibilities to the father and its temporary suspension of parent-child contact with his mother. Id. ¶ 33. The Court acknowledged that the trial court had considered the relevant statutory factors and provided a reasoned basis for its conclusions. Id. Noting the mother's frustration at the father's failure to cooperate in facilitating any contact between her and the child, this Court wrote, "We note that mother is not without recourse should father and stepmother continue to interfere with her attempts at reunification or should they defy the trial court's order." Id. ¶ 34. In addition to deferring to the factfinder's assessment concerning the child's best interests, the majority was willing to support the trial court's hope, despite its own skepticism, that this time the father and stepmother would be sufficiently chastened by the court's admonition that they would comply with its order to take specified steps to facilitate the child's reunification with his mother.

¶ 42. In this case, by contrast, the trial court had ample basis to believe that the future would not mirror the past. The trial court observed that mother's partner and grandfather, apparently the two most influential adults in her life, had been unaware of her prior misbehavior vis-a-vis father. The court clearly had confidence that they would hold mother's feet to the fire. Moreover, the court made it clear to all parties that if mother did not change her ways, the court would reassign parental rights and responsibilities. By conducting its own review of the record to reach a contrary conclusion, the majority has failed to afford the trial court the deference it is due. Although the majority may have weighed the evidence differently, the trial court's expectation that mother would improve her conduct had ample support in the record.

¶ 43. For the above reasons, I would affirm the trial court's decision.

_____
Associate Justice

21