REIBER, C.J.
 

 ¶ 1. Father appeals from the denial of his motion to modify legal and physical parental rights and responsibilities in the parties' son D.B. Father argues that the court improperly treated the child's maternal grandfather as a "fictive parent" and gave him too much weight in evaluating the statutory best-interests factors. We affirm the court's finding that changed circumstances exist, but reverse and remand its best-interests analysis for additional proceedings.
 

 I. Procedural History
 

 ¶ 2. We recount the procedural history in detail as it bears on the ruling at issue here. D.B. was born in January 2007. When parents divorced in November 2011, they agreed that mother would have physical rights and responsibilities in D.B. and the parties would share legal rights and responsibilities. The parenting plan contemplated that mother and D.B. would live in North Carolina. Father would have twice-weekly Skype contact with D.B., five weeks of visitation during the summer, and the parties would split other school vacations.
 

 ¶ 3. Mother did not abide by the parent-child contact order, and by June 2012 father filed his first motion to enforce parent-child contact. Mother did not respond or appear at the hearing on the motion. In a February 2013 order, the court awarded father an additional week of summer contact to make up for a week of spring vacation that mother had withheld.
 

 ¶ 4. In December 2015, father filed a second motion to enforce. Again, mother did not appear at a hearing on the motion. In June 2016, the court found that mother had withheld four weeks of visitation from father, including D.B.'s 2015 spring vacation, his two-week 2015 Christmas vacation, and his 2016 spring vacation. Mother consistently withheld father's twice-weekly Skype contact as well. The court expanded father's 2016 and 2017 summer visits to seven weeks and ordered mother to abide by the Skype contact. The court directed mother to turn D.B. over to father on July 9, 2016 for his summer visit and ordered her to facilitate Skype contact. Mother was advised that her failure to comply could lead to contempt proceedings. A sheriff served mother a copy of the court's order. Nonetheless, when father went to retrieve D.B. on the arranged date, mother and D.B. were nowhere to be found. Father was forced to return to Vermont without the child.
 

 ¶ 5. In July 2016, father filed a third motion to enforce and a motion for contempt; he also moved to modify parental rights and responsibilities. Mother did not appear at the hearing on father's motions. In a September 2016 order, the court found mother in contempt. It found that mother willfully violated court-ordered visitation in April 2015, December 2015, April 2016, and July 2016. It made more extensive findings on the record. Based on the evidence presented at the hearing, the court found that it was no longer in D.B.'s best interests to remain in mother's custody. Effective September 24, 2016, it transferred legal and physical custody of D.B. to father and it ordered mother to turn D.B. over to father. The court scheduled a hearing on October 3, 2016, to discuss mother's visitation.
 

 ¶ 6. Notwithstanding the court's order, mother did not turn D.B. over to father. Mother initially told father's attorney that D.B. was away for the weekend. Mother did not appear for the October 3 hearing and made an excuse for her absence that the court did not find credible. In an October 2016 ruling, the court found that mother failed to abide by its orders or purge herself of prior contempts. It issued a separate arrest warrant requiring that mother be brought before the court as soon as she was found. The court asked North Carolina authorities to give its order full faith and credit and to turn D.B. over to his legal custodian. A North Carolina court subsequently issued an order for expedited enforcement of a foreign child custody order,
 
 [1]
 
 and mother finally turned D.B. over
 to father on October 18, 2016. At that point, father had not seen D.B. for fourteen months.
 

 ¶ 7. Counsel for mother entered a notice of appearance on October 31, 2016, and in November 2016 mother requested parent-child contact. The court later clarified that its transfer of custody to father in September 2016 had been on a temporary interim basis based on mother's failure to facilitate visitation with father and her willingness to ignore court orders to thwart father's visitation. While the court had heard limited testimony to ensure that father could safely and adequately provide for D.B., it did not at that time have any basis for comparison to the environment that mother provided. The court thus scheduled an evidentiary hearing on what custody arrangement was in D.B.'s best interests.
 

 II. Ruling on Motion to Modify
 

 ¶ 8. Following a hearing, the court issued a September 2017 order concluding that it was in D.B.'s best interests that mother have primary physical custody. It made the following findings. Father works as a software engineer. He shares a house with two roommates. D.B. has friends in the neighborhood and at school. He sees his paternal grandparents at least once a week. D.B. was doing well in school and he easily managed the transition back to Vermont. Father does not have a driver's license and his activities with D.B. were more restricted than D.B.'s activities in North Carolina.
 

 ¶ 9. While D.B. was living with mother, mother did not communicate information about him to father. She has never abided by the Skype time ordered. She ignored father's texts and calls and threw away a birthday card that father had sent to D.B., causing D.B. to believe that father was ignoring him. The court recited detailed evidence showing that father repeatedly asked for contact, visitation, and information about D.B. and mother ignored him, made excuses why D.B. was not available, and tried to alter contact dates. Mother treated father's contact with D.B. as a nuisance, which she would occasionally grant if father begged enough and if it was convenient. Mother also interfered with father's ability to obtain medical information about D.B. and refused to provide father with D.B.'s health insurance information.
 

 ¶ 10. When D.B. returned to Vermont, mother ignored father's attempts to set up regular communication with D.B. Despite mother's behavior, father was very good at ensuring that mother and D.B. communicated. During this time, mother sent messages to D.B. intimating that his home was with her and suggesting that she was trying to "rescue him" from Vermont. Mother also told D.B. that she was going to put surveillance tracking on his iPad so that she would know that it was really him talking. While mother denied doing these things at the hearing, the court did not find her credible. The court found that mother clearly had boundary issues.
 

 ¶ 11. D.B.'s maternal grandfather is an opthamologist and surgeon, and the court found that "he frankly tip[ped] the balance" in this case. The court found little positive to say about mother's parenting other than that she loved D.B. Grandfather, however, provided mother with a job and a nice house in a nice neighborhood. The court found that grandfather was "really D.B.'s fictive parent in North Carolina." Grandfather took D.B. to most of his activities and often participated in these activities with D.B. D.B. often spent the night at grandparents' house or their summer house. D.B. enjoyed a higher standard of living, better housing, and was engaged in more activities in North Carolina than in Vermont. The court noted that all of this would evaporate if something happened to grandfather or if mother became estranged from him. Mother
 had apparently hidden father's attempts to contact D.B. from grandfather. She did not tell grandfather about the court's orders. Grandfather thought father was ignoring D.B. Grandfather first learned otherwise when a warrant issued for mother's arrest.
 

 ¶ 12. Mother is engaged to a new partner with whom she had been living for two years at the time of the hearing. Mother and her partner have two young children. D.B. benefited from the partner's presence. Like grandfather, the partner did not know that mother was denying visits to father and avoiding contact with father.
 

 ¶ 13. The court found that mother had an indescribable flat affect during the hearing, and her testimony was monotone and not credible. The court questioned whether mother had been diagnosed with any mental health issues. The testimony indicated that mother had seen the same therapist for thirteen years and that she had been diagnosed with ADD/ADHD and suffered panic attacks, and that she experienced some post-partum depression. The court stated its belief that there was more going on than what it had been told.
 

 ¶ 14. The court determined that mother engaged in a calculating and knowing attempt to thwart visitation and that D.B. was harmed by her actions. Nonetheless, it concluded that the statutory best-interests factors narrowly favored mother having physical custody of D.B. and "only due to [grandfather]'s presence in D.B.'s life." Turning to the specific best-interests factors, the court found that both parents could provide D.B. with love and affection and guidance and each adequately provided him food, clothing, medical care, a safe environment, and other material needs. Mother alone would not do as well as father in providing for D.B.'s developmental needs. When in North Carolina, however, mother "delegate[d] this to her father ... who does an outstanding job." D.B. did well in school and in his community in both North Carolina and Vermont. Mother had demonstrated her inability to support contact with father. Father, on the other hand, encouraged mother to be in contact with D.B.'s school and therapists in Vermont. He was diligent in ensuring that mother communicated with D.B. Mother had been D.B.'s primary parent for most of his life; father had done a good job since D.B. arrived in Vermont. D.B. has a good relationship with father's parents in Vermont. The court's decision, however, "turn[ed] on [D.B.'s] relationship with ... his maternal grandfather." Grandfather appeared to occupy most of D.B.'s nonschool time with enriching activities.
 

 ¶ 15. The court acknowledged that its decision had been "an extremely close call." It reiterated that its conclusion was based on grandfather's involvement with D.B. as well as its belief that going forward, mother would support father's contact with D.B. The court stated that it would "not touch" the joint legal rights and responsibilities that the parties had originally agreed to, observing that it would be difficult for the parties to share custody even if they were not 1000 miles apart. Father appealed from this order.
 

 III. Analysis
 

 ¶ 16. At the outset, we note that no party challenges the court's finding that there had been a real, substantial change in circumstances, and we affirm this portion of the court's ruling. Father focuses on the court's best-interests analysis. He argues that mother should not have been awarded physical custody given her alienating and contemptuous behavior and her delegation of parenting responsibilities to grandfather. He contends that the court placed too much weight on grandfather in evaluating the statutory best-interests factors, and its order improperly elevated grandfather over him, thereby interfering with his constitutional right to parent D.B.
 

 Father also asserts that the court erred by failing to address his request for primary legal parental rights and responsibilities given the breakdown of communication between the parties.
 

 ¶ 17. We agree that the court erred. While the court has broad discretion in evaluating the statutory best-interests factors,
 
 Maurer v. Maurer
 
 ,
 
 2005 VT 26
 
 , ¶ 10,
 
 178 Vt. 489
 
 ,
 
 872 A.2d 326
 
 (mem.), its approach here was unfair and inconsistent with the plain language of 15 V.S.A. § 665(b). The court also failed to fairly account for mother's egregious behavior toward father and explain the basis for its belief that mother's behavior would change going forward. We conclude that the court abused its discretion, and we therefore reverse and remand for additional proceedings. See
 
 Cooter & Gell v. Hartmarx Corp.
 
 ,
 
 496 U.S. 384
 
 , 405,
 
 110 S.Ct. 2447
 
 ,
 
 110 L.Ed.2d 359
 
 (1990) (stating that abuse of discretion exists where a ruling based "on an erroneous view of the law or on a clearly erroneous assessment of the evidence").
 

 ¶ 18. In a contested custody case such as this one, the court must compare parent to parent.
 
 [2]
 
 We recognized this in
 
 Miles v. Farnsworth
 
 ,
 
 121 Vt. 491
 
 , 495,
 
 160 A.2d 759
 
 , 761-62 (1960). In that case, pursuant to the parties' agreement, a grandmother was providing the actual care for a child, although the father had nominal custody. At the mother's request, the court modified its order to award custody to mother. We affirmed its decision on appeal. We found it "apparent that the real issue determined by the court below was whether the mother or the grandmother should have the actual and active custody of the boy," but we emphasized that "the grandmother is actually a third person to this marriage relationship."
 

 Id
 

 . at 495
 
 ,
 
 160 A.2d at 761
 
 . "As between a mother and a third party," we explained, "the mother must prevail in a custody case, in the absence of compelling reasons to the contrary which are not present here."
 

 Id
 

 .
 
 When the attributes of the father and mother were compared, the court's findings supported the award of custody to the mother.
 

 ¶ 19. While this case predated the enactment of 15 V.S.A. § 665, the controlling standard in
 
 Miles
 
 , and subsequently, has always been the best interests of the child. See
 
 Paquette v. Paquette
 
 ,
 
 146 Vt. 83
 
 , 90,
 
 499 A.2d 23
 
 , 28 (1985) (recognizing, as of 1985, that best-interests-of-the-child standard "has been the primary consideration in determining issues of custody for over sixty years"); see also
 
 Miles
 
 ,
 
 121 Vt. at 493
 
 ,
 
 160 A.2d at 760
 
 (finding it "well settled that it is the welfare of the child which in the last analysis is determinative in a custody matter" and equally well settled that there must be change in circumstances to modify existing custody order (quotation omitted) );
 
 Raymond v. Raymond
 
 ,
 
 120 Vt. 87
 
 , 95,
 
 132 A.2d 427
 
 , 431-32 (1957) ("The matter of custody is not an easy one for the court to determine, and it often involves a balancing of the advantages and disadvantages incurred by granting custody to one spouse or the other. The good of the child is the paramount consideration and it is for the court to weigh every circumstance bearing on the child's future welfare in passing on this question."). Certainly, the
 
 Miles
 
 Court recognized that the grandmother played an
 important role in the child's life; indeed, she had been the child's primary caregiver for seven years, beginning when the child was eighteen months old. It made clear, however, that the grandmother was not a parent, and thus the Court was required to compare the mother to the father. See
 
 Miles
 
 ,
 
 121 Vt. at 495
 
 ,
 
 160 A.2d at
 
 761-62 ; see also
 
 Moreau v. Sylvester
 
 ,
 
 2014 VT 31
 
 , ¶ 30,
 
 196 Vt. 183
 
 ,
 
 95 A.3d 416
 
 (stating that "crux" of
 
 Miles
 
 was whether mother established change of circumstances, but "[t]o the extent that
 
 Miles
 
 considered third-party rights, it concluded that short of extraordinary circumstances, a mother's rights as a natural parent trumped third-party, and even grandmotherly, interests in the custody of the child").
 

 ¶ 20. The statutory best-interests factors echo this holding, and most of the factors expressly require a parent-to-parent comparison. See
 
 Harris v. Harris
 
 ,
 
 149 Vt. 410
 
 , 417-18,
 
 546 A.2d 208
 
 , 213-14 (1988) (noting that "[a]lmost all the [statutory] factors begin with some variation of the words 'the ability and disposition of each parent to,' " and concluding that 15 V.S.A. § 665"requires each parent to show his or her relationship with the child in light of the statutory factors," rather than simply showing that other parent is inadequate, thereby ensuring "more balanced and complete analysis" required by statute). Most factors focus on each
 
 parent
 
 's ability to accomplish certain things on behalf of their child. Thus, the court must consider "the ability and disposition of each
 
 parent
 
 to meet the child's present and future developmental needs," and "the relationship of the child with each
 
 parent
 
 and the ability and disposition of each
 
 parent
 
 to provide the child with love, affection, and guidance." 15 V.S.A. § 665(b)(1), (3) (emphases added).
 

 ¶ 21. Certainly, grandfather's relationship with D.B. is important and worthy of consideration. There is a separate statutory best-interests factor that specifically addresses "the relationship of the child with any other person who may significantly affect the child."
 

 Id
 

 .
 
 § 665(b)(7). We agree that this can be a critical factor in assessing a child's best interests and it may tip the scales in the best-interests analysis. The court here, however, improperly allowed grandfather's relationship with D.B. to permeate other best-interests factors that are limited by their plain terms to an evaluation of
 
 parents'
 
 capacities. In considering § 665(b)(3), the court erred in concluding that although mother "alone" would not do as well as father in providing for D.B.'s developmental needs, she "delegate[d]" this parental responsibility to her father "who does an outstanding job." The court was required to compare father to mother "alone," not father to a third party. Grandfather was not being awarded custody, and as the trial court acknowledged, if anything happened to grandfather, the factors that favored
 
 mother
 
 "would quickly evaporate."
 

 ¶ 22. As pertains to the court's reliance upon grandfather's key role in the best-interests calculus and mother's parental responsibilities, § 665(b)(5), there was no evidence or finding as to grandfather's orientation to supporting and facilitating a positive relationship and frequent and continuing contact between D.B. and his father in the face of mother's alienating behavior, other than grandfather's apparent belief, prior to the revelation of mother's conduct, that father was a "cold person who never sent his son a birthday or Christmas card," and to his knowledge "had not tried to contact his son in a year." The court similarly failed to square its findings about mother's alienating behavior with its conclusion that mother and father could equally provide D.B. with "love, affection, and
 
 guidance
 
 ."
 

 Id
 

 .
 
 § 665(b)(1) (emphasis added); see
 
 Spaulding v. Butler
 
 ,
 
 172 Vt. 467
 
 , 477,
 
 782 A.2d 1167
 
 , 1175 (2001) (concluding that trial
 court's finding that this factor favored father was undermined by its findings that father "was engaged in a long-term, persistent campaign to cut off any relationship" between child and mother).
 

 ¶ 23. As set forth above, the court found little positive to say about mother's parenting other than that she loved D.B. Mother engaged in egregious behavior designed to thwart father's relationship with the child. She repeatedly denied father visitation with D.B. over the course of many years. She failed to attend court hearings. She defied numerous court orders designed to ensure that father had parent-child contact. Her behavior was detrimental to D.B. It took an arrest warrant and court action in North Carolina for mother finally to abide by the court's order and allow father to have contact with D.B. Mother deprived father of parent-child contact for fourteen months.
 
 [3]
 

 ¶ 24. Certainly, mother's "sustained course of conduct ... designed to interfere in the child's relationship" with father "casts serious doubt" upon mother's fitness "to be the custodial parent."
 
 Miller-Jenkins v. Miller-Jenkins
 
 ,
 
 2010 VT 98
 
 , ¶ 15,
 
 189 Vt. 518
 
 ,
 
 12 A.3d 768
 
 (mem.) (quotation omitted); see also 15 V.S.A. § 650 (finding and declaring as public policy that it is in best interests of child to have "opportunity for maximum continuing physical and emotional contact with both parents, unless direct physical harm or significant emotional harm to the child or a parent is likely to result from such contact"). We have recognized that because children thrive with love and support of both parents, "[o]ne parent's attempts to hamper
 the other's parent-child relationship therefore typically demonstrates a lack of regard for the child's best interests and suggests that a transfer of custody may well be in the child's best interests."
 
 Miller-Jenkins
 
 ,
 
 2010 VT 98
 
 , ¶ 25,
 
 189 Vt. 518
 
 ,
 
 12 A.3d 768
 
 ; see also
 
 Sundstrom v. Sundstrom
 
 ,
 
 2004 VT 106
 
 , ¶ 38,
 
 177 Vt. 577
 
 ,
 
 865 A.2d 358
 
 (mem.) (recognizing that "obstruction of visitation and attempts at parental alienation are not in a child's best interests, and they may form the basis for a change in custody," and citing cases so holding).
 

 ¶ 25. Although the trial court acknowledged that mother's refusal to allow visitation was detrimental to D.B., it believed that going forward, mother would support father's contact with the child. The court's findings do not support such a belief, however, and there is nothing in the record to show that mother regrets her behavior, has any self-awareness about her conduct, or that she is committed to ensuring parent-child contact in the future. To the contrary, while D.B. was in Vermont with father, mother continued to engage in alienating and obstructive behavior. She also repeatedly lied about her behavior during the hearing in this case and took no responsibility for her actions or the consequences of her behavior on D.B. or father. She professed not to have read a court order served on her by a sheriff or know that father was arriving in July 2016 to pick up D.B.; she denied depriving father of parent-child contact, asserting that she had to block father's calls because he was "harassing" her and that he should have come up with other ways to contact her; she testified that she did not feel that she had denied father parent-child contact; she led other people, including D.B., to believe that father did not want any contact; and she also believed that her communications with D.B. while he was at his father's home were appropriate.
 
 [4]
 

 ¶ 26. The court's belief that mother's behavior would change was a linchpin of its decision. Because this belief is unsupported by any findings or evidence, and because the court erred in its evaluation of the statutory best-interests factors, we reverse and remand for additional proceedings consistent with this opinion. Given the significant passage of time, the court should take new evidence on what course of action is in D.B.'s best interests.
 

 See
 
 Engel v. Engel
 
 ,
 
 2012 VT 101
 
 , ¶ 19,
 
 193 Vt. 19
 
 ,
 
 71 A.3d 1124
 
 (similarly concluding that "[g]iven the significant passage of time" since prior hearing, trial court on remand "should conduct an additional evidentiary hearing to assess the current best interests of the children"). Given our conclusion, we do not reach father's argument that the court erred by ignoring his request for sole legal rights and responsibilities. We emphasize, however, that on remand, the court must consider the appropriate award of both physical and legal custody.
 

 The court's finding of changed circumstances is affirmed; its best-interests analysis is reversed and remanded for additional proceedings consistent with this opinion
 
 .
 

 The North Carolina court found that Vermont, as the issuing court, had, and continued to have, jurisdiction over this matter. Although mother has raised no jurisdictional challenge, we agree with the North Carolina court that Vermont continues to have jurisdiction over this case. Vermont issued the initial child custody determination in this case at a time when all parties were living in Vermont. See 15 V.S.A. § 1071. Because Vermont made the initial child custody determination, Vermont "has exclusive, continuing jurisdiction over the determination" until "a Vermont court determines that neither the child nor the child and one parent ... have a significant connection with Vermont, and that substantial evidence is no longer available in Vermont concerning the child's care, protection, training, and personal relationships," or a court determines that the child and
 
 both
 
 parents, or any person acting as a parent, "do not currently reside in Vermont."
 

 Id
 

 .
 
 § 1072(a)(1), (2). "The law is clear that only a court of the
 
 issuing state
 
 can decide that it has lost jurisdiction due to erosion of a 'significant connection' between the child and the state."
 
 Ward v. LaRue
 
 ,
 
 2016 VT 81
 
 , ¶ 18,
 
 202 Vt. 499
 
 ,
 
 150 A.3d 631
 
 (quotation omitted). Vermont has never relinquished jurisdiction over this matter, and father continues to reside in Vermont. D.B. also resided in Vermont with father between October 2016 and September 2017. There is no question that Vermont retains jurisdiction. See
 
 id
 
 . ¶ 20 (recognizing that Vermont, as issuing court, retained jurisdiction over child-custody dispute and substantial evidence continued to be available in Vermont where father remained in Vermont and key issues were father's access to information about child and enforcement of his right to parent-child contact).
 

 Under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), "[a] Vermont court which has jurisdiction under this chapter to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances, and that a court of another state is a more appropriate forum." 15 V.S.A. § 1077(a). Again, mother did not argue that Vermont was an inconvenient forum, and the court thus made no ruling on this question. It is apparent, however, that at the time the court rendered its decision, significant evidence concerning D.B.'s best interests was available in Vermont, D.B. himself was living in Vermont, the Vermont court was poised to decide the issues before it expeditiously, and the Vermont court was intimately familiar with the facts and issues in the pending litigation given its many orders in this case prompted by mother's ongoing refusal to allow father to have contact with D.B. See
 
 id
 
 . § 1077(b)(6)-(8) (identifying factors, including those cited, as relevant to "inconvenient forum" analysis). We relied on similar factors in
 
 Ward
 
 ,
 
 2016 VT 81
 
 , ¶ 23,
 
 202 Vt. 499
 
 ,
 
 150 A.3d 631
 
 . There, we upheld the trial court's conclusion that Vermont remained a convenient forum to resolve a child custody dispute where the father remained in Vermont, "Vermont ha[d] issued numerous orders since mother relocated, all of which stemmed from mother's failure to comply with existing orders," there were "no disputes about mother's ability to exercise her parental rights," evidence was "easily accessible in Vermont," "Vermont courts ha[d] decided the issues expeditiously," and "Vermont courts [were] also familiar with the facts and issues in [the] proceedings."
 

 Id
 

 .
 
 Indeed, not unlike the present case, we emphasized the importance of this final factor "given mother's ongoing behavior and the fact that mother was previously warned that her continued interference with father's rights [might] trigger a change in custody."
 

 Id
 

 .
 
 As in
 
 Ward
 
 , Vermont continues to be a convenient forum under the UCCJEA.
 

 Despite the court's references to grandfather as D.B.'s "fictive parent" in North Carolina, the court did not consider or find that grandfather was entitled to status as a "parent" under Vermont law. Cf.
 
 Sinnott v. Peck
 
 ,
 
 2017 VT 115
 
 , ¶ 1, --- Vt. ----,
 
 180 A.3d 560
 
 (considering "whether an individual who is not biologically related to a child, has not legally adopted the child, and is not married to the child's legal parent may be the child's legal parent").
 

 The dearth of any positive findings concerning mother (to say nothing of the many negative findings about her) distinguishes this case from the cases cited by the dissent,
 
 post
 
 , ¶¶ 32-33. In
 
 Harris v. Harris
 
 , for example, the trial court found that a child's grandmother "played a significant role in his life and development," but it also found that the father "spent a significant amount of time with [the child]" and "the two engaged in a variety of activities constructive to [the child's] emotional development."
 
 162 Vt. 174
 
 , 179,
 
 647 A.2d 309
 
 , 313 (1994). The remaining cases cited by the dissent similarly show some positive attributes of the parent being awarded custody and they do not rely solely on the child's relationship with a third party. See
 
 Habecker v. Giard
 
 ,
 
 2003 VT 18
 
 , ¶¶ 10-14,
 
 175 Vt. 489
 
 ,
 
 820 A.2d 215
 
 (mem.) (recognizing in proposed relocation case that children's relationships with maternal and paternal grandparents and aunts who lived in Vermont was "critical component" of court's decision to transfer custody to father, but decision also relied on findings that father was better suited to provide safe environment for children, father was " 'much more likely to assure a positive relationship and ongoing contact with mother than the reverse,' " father offered children more stability than mother, and father was better able to place children's needs ahead of his own);
 
 deBeaumont v. Goodrich
 
 ,
 
 162 Vt. 91
 
 , 99-100,
 
 644 A.2d 843
 
 , 848 (1994) (upholding transfer of custody to father in proposed relocation case, and explaining that trial court found both parents "dedicated, caring, sensitive, conscientious, moral and effective" and both were strongly bonded to children, but father had steady disposition, good job, children could remain in community and school where they had done well, children would have continuing contact with paternal grandparents who had become very important in their lives, and father was more likely to foster good relationship with other parent).
 

 As these cases and the statute reflect, the significance of a third party's relationship with a child is one factor among many. It is possible that this factor could provide the "tipping point" in a custody award, and we do not suggest otherwise. The bulk of the best-interests factors, however, require the court to consider each
 
 parent
 
 's ability to satisfy the relevant best-interests criteria and they do not allow the court to compare a parent to a third party. The error here was the court's comparison of father to grandfather where the statute clearly required it to consider "each
 
 parent
 
 's ability and disposition" to accomplish certain things. The court considered grandfather in evaluating statutory best-interests factors that, by their terms, did not involve him.
 

 This case is significantly different from
 
 Knutsen v. Cegalis
 
 ,
 
 2016 VT 2
 
 ,
 
 201 Vt. 138
 
 ,
 
 137 A.3d 734
 
 (
 
 Knutsen I
 
 ), cited by the dissent,
 
 post
 
 , ¶ 41, and
 
 Knutsen v. Cegalis
 
 ,
 
 2017 VT 62
 
 , --- Vt. ----,
 
 172 A.3d 180
 
 (
 
 Knutsen II
 
 ). In
 
 Knutsen I
 
 , we concluded that the trial court had properly focused its analysis on the child's best interests, and upheld its decision that, despite the father and stepmother's egregious alienating acts, the child's best interests required that he remain in the father's custody. The trial court there found by clear and convincing evidence that "the child would be at significant risk of mental health problems" if reunification efforts with mother continued, and "it did not matter why the child was at risk; what mattered was that the risk existed."
 
 2016 VT 2
 
 , ¶ 31,
 
 201 Vt. 138
 
 ,
 
 137 A.3d 734
 
 . In
 
 Knutsen II
 
 , we recognized that father and stepmother continued to act egregiously, yet they had also testified "to a change-of-heart as to reunifying [the child] with mother."
 
 2017 VT 62
 
 , ¶ 11,
 
 172 A.3d 180
 
 . While the trial court "viewed the stated change-of-heart very skeptically,"
 
 id
 
 . ¶ 13, it cited this testimony in its decision and "relied a great deal on father's and stepmother's stated positions as a basis for its ruling."
 
 Id
 
 . ¶ 15. We deferred to the trial court's credibility assessment and the court's assessment of the evidence that it "had before it at the time."
 
 Id
 
 . ¶ 22. Unlike
 
 Knutsen II
 
 , mother here has not disavowed her conduct or promised to change her behavior going forward. To the contrary, as recounted above, mother does not appear to believe that she has done anything wrong. The trial court's "hope" that grandfather would "encourage" mother to abide by parent-child contact orders is not grounded in any evidence and it does not suffice to support the court's key finding here. Cf.
 
 post
 
 , ¶ 42.